# United States Court of Appeals
## For the First Circuit

No. 23-1692

UNITED STATES OF AMERICA,

Appellee,

v.

SIXTO JORGE DÍAZ-COLÓN,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Francisco A. Besosa, U.S. District Judge]

Before

Barron, Chief Judge,
Lipez and Thompson, Circuit Judges.

Rafael F. Castro Lang for appellant.

John-Alex Romano, with whom Nicole M. Argentieri, Principal
Deputy Assistant Attorney General; Lisa H. Miller, Deputy
Assistant Attorney General; Michael N. Lang, Trial Attorney,
Public Integrity Section; W. Stephen Muldrow, United States
Attorney; and Myriam Y. Fernández-González, Assistant U.S.
Attorney, were on brief, for appellee.

December 2, 2025

**LIPEZ**, **Circuit Judge**.    A federal jury found that appellant Sixto Jorge Diaz-Colon attempted to extort a Puerto Rico government official by threatening the release of communications politically damaging to the then-governor and his administration unless the official arranged a $300,000 payment and met other demands.    See 18 U.S.C. § 1951.    He also was found guilty of transmitting a threatening communication and destroying records pertaining to a federal investigation.    See id. §§ 875, 1519.

In this appeal, Diaz-Colon asserts multiple errors in his prosecution and trial.    He claims that the evidence was insufficient to support any of the three counts on which he was convicted, the government violated his due process rights by suborning perjury from witnesses, the trial evidence materially varied from the allegations in the indictment, the district court violated his Sixth Amendment rights in managing the admission of evidence, and the court improperly instructed the jury.    After carefully reviewing the record, we find no merit in any of these contentions and therefore affirm the convictions.

## I. Background

Diaz-Colon's varied challenges "require us to present the facts from two different perspectives."    United States v. Facteau, 89 F.4th 1, 15-16 (1st Cir. 2023).    To evaluate his sufficiency-of-the-evidence claims, "we take the facts in the light most favorable to the verdict[s]."    Id. at 16.    "For the

other issues on appeal, we present the facts in a 'balanced' way, taking an 'objective[] view' of the evidence in the record." Id. (alteration in original) (quoting United States v. Burgos-Montes, 786 F.3d 92, 99 (1st Cir. 2015)). We first address the sufficiency claims and therefore set forth the facts in this section as the jury could have found them. To the extent that factual development is needed to assess Diaz-Colon's remaining challenges, we will adopt the more balanced approach.

## A. The Opening Salvo

Appellant Diaz-Colon produced a political news program, Nación Z, that regularly brought him into contact with Anthony Maceira, an attorney who served in the administration of former Puerto Rico Governor Ricardo Rosselló as the executive director of the Puerto Rico Ports Authority and Secretary of Public Affairs.[1] In addition to Maceira's appearances on Diaz-Colon's program, which aired on radio and television, the two men communicated weekly, including through Telegram, a cloud-based messaging system used by officials in the Rosselló administration. Telegram users have the option to send "secret" messages,[2] and the system also

---

[1] Much of the evidence recounted in this section comes from Maceira's testimony and associated documents that were admitted as exhibits at trial. Other key testimony was provided by FBI Special Agent Juan Carlos López-Velázquez ("López"). See infra.

[2] Maceira testified that, when a user sends a "secret" message, the sender is notified if the recipient "takes a screen

allows senders to delete messages from both their own devices and recipients' devices.

On June 20, 2019, Diaz-Colon sent Maceira a secret Telegram message intimating that Raul Maldonado-Nieves, the son of then-Treasury Secretary Raul Maldonado,[3] would release damaging information about the Rosselló administration if the administration did not stop political attacks against Maldonado. At that time, Maldonado was being publicly criticized for allegedly improper interference in contract and personnel matters, and a newspaper had reported "alleged investigations because of possible misconduct" by Maldonado. According to Maceira, the administration "had been dealing with a lot of reports about allegations of corruption in public agencies."

As translated, Diaz-Colon's message stated:

Man, if Fortaleza [i.e., the administration] doesn't stop fucking with Raul Maldonado, RAUL MALDONADO'S SON HAS STRONG EVIDENCE TO FUCK THIS ADMINISTRATION STARTING WITH RICARDO ROSSELLO.

According to Raulie [Maldonado-Nieves's nickname] "son of RM", you and Fortaleza are the ones who are behind this firepower against Raul Maldonado.

shot or a picture of the screen" and if the recipient "forward[s] the message."

[3] We refer throughout this opinion to the father as "Maldonado" and the son as "Maldonado-Nieves," but at times use the latter's nickname, "Raulie," to accurately reflect quoted material.

- 4 -

I tell you brother, RAUL'S SON IS GOING TO DESTROY YOU ALL AT OTHER LEVELS.

I don't know what you are going to do. But if they don't stop THE POPULARS ARE GOING TO BE IN POWER FOR 30 YEARS.

STOP THIS.

This is crazy.

I have a friend who is a close friend of RM's son, and they want to see me to deliver hard evidence to me and other media. This administration is fucked. I need to stop this.

Maceira did not know what Diaz-Colon meant by "hard evidence," but he was "scared" and "concerned."[4] He explained at trial that Maldonado had that same morning accused "Fortaleza" -- meaning the Rosselló administration, for which Maceira was the spokesperson -- of being "behind the[] public reports" critical of Maldonado, and Maceira "understood [the Telegram message] to be a reference to that." He viewed the Telegram message as a threat and reported it to the governor and the governor's chief of staff.

_____

[4] Maceira elaborated on his concern at trial as follows:

As secretary for Public Affairs, . . . my job was being the face of the Government, the voice of the Government, and that meant with the good and the bad. In the just six months I had been there, I had had to face multiple public crises, and this was a threat from a radio producer, TV producer, which I had to take seriously. I was scared. I was concerned about what we would be dealing with.

After speaking with the governor, Maceira arranged to meet Diaz-Colon the next day, June 21, at a San Juan restaurant, Musa. At trial, Maceira described his motivation for the meeting as follows: "I had received a threatening message . . . saying that I was going to be destroyed, the administration was going to be destroyed, but I didn't have any further context to that. I needed specifics about what the threat meant."

## B.  The Meeting at Musa

When the two men met at Musa, Maceira surreptitiously attempted to record their conversation on his phone.[5] Early in the meeting and multiple times throughout, Maceira told Diaz-Colon he viewed the Telegram message as a threat. Diaz-Colon apologized, explaining that Maldonado-Nieves, who was sitting beside him when he messaged Maceira, possessed a binder of printed-out chat messages sent by administration officials, including the governor, that reflected poorly on those officials. Diaz-Colon said he alerted Maceira because what he had seen was "going to destroy" Maceira and others in the administration.

---

[5] Maceira later provided the recording to the FBI, but as discussed further below, not all of it was audible.

We note that the trial transcript indicates that Maceira initially stated in response to questioning that he told Diaz-Colon of his intent to record the meeting. However, the subsequent questioning by defense counsel makes clear that, in fact, Maceira did <u>not</u> inform Diaz-Colon that he would be recording their conversation.

- 6 -

Maceira testified that he did not believe Diaz-Colon's apology was genuine:

> To simply put it the way I saw it, it was gangster style. We have all seen the movies, the gangsters, they put their hand on your shoulder, press you a little bit, say, I don't want to hurt you, don't worry I love you, I don't want to hurt you, but if you don't do X, I am going to have to do Y. Don't make me do that.

Maceira testified that, "[t]hroughout the conversation," Diaz-Colon referred to the binder of messages -- "a binder full of devastating information that would destroy us all" -- and said Maldonado-Nieves "was pissed" that the administration was not "supporting his father with all the public attacks that were coming out." Diaz-Colon told Maceira that Maldonado-Nieves "was pointing directly at [Maceira] for being behind the firepower that . . . he was alleging was against his father." Maceira also felt that Diaz-Colon was "flexing his knowledge, his power, his influence," including by "list[ing] names of influential people that he controlled" and "showing . . . how much damage they could do or he could do if he were to take these things and turn them into scandals for the administration and for myself."[6]

---

[6] In his testimony, Maceira named the individuals mentioned by Diaz-Colon, explaining that they are hosts of radio shows and that "[s]ome of them are very influential in social media as well . . . what we classified as opinion makers."

The chat messages in the binder contained "disparaging and profanity-laced Telegram messages involving [Governor Rosselló] and his associates."[7] One chat referred to evidence indicating that the attorney general had improperly failed to investigate an adviser to the governor whose conduct had been referred to the Department of Justice, and another message purportedly quoted the governor as referring to another official as an "asshole." Others contained "insults against women." Diaz-Colon also reported that Maldonado-Nieves was pursuing "damaging information" about Maceira and the Ports Authority.

After warning that the messages "were gossip with the potential of becoming scandals for the administration," Diaz-Colon told Maceira how he could prevent their disclosure and otherwise protect the administration's public image. First, he said Maldonado-Nieves was demanding $300,000 to withhold the release of the binder. Second, Diaz-Colon offered to provide positive news coverage for Maceira and the administration if Maceira guaranteed that the government would buy advertising on his program. Third, Diaz-Colon asked for help in securing renewal of two government

---

[7] We borrow this characterization from the district court's recitation of the trial evidence in its Opinion and Order denying Diaz-Colon's motions for acquittal and new trial. See United States v. Díaz-Colón, No. 21-017, 2023 WL 3321488, at *1 (D.P.R. May 9, 2023).

contracts from which he would financially benefit,[8] and, in return, Maceira would be "guarantee[d] . . . access to raise [his] public image and personal protection for [his] public image."

Maceira ended the meeting after about ninety minutes and told Diaz-Colon he would remain in touch. Shortly thereafter, believing that Diaz-Colon was trying to extort him, Maceira consulted with a friend about what to do and concluded that he should meet with a former federal law enforcement official for guidance. Maceira flew to Florida for that meeting on June 24, and his contact there agreed to connect him with the FBI.

## C. Maldonado's Termination and Government Turmoil

The same day that Maceira traveled to Florida, June 24, Governor Rosselló dismissed Maldonado from his position as treasury secretary. Also that day, Maldonado appeared on Diaz-Colon's program, Nación Z, and accused the government of having an "institutional mafia." Around July 1, additional allegations of government corruption became public, including some made by Maldonado-Nieves. According to Maceira, the Rosselló administration was "under fire."

In early July, some of the controversial chat messages were leaked. On July 13, 889 pages of Telegram chats involving senior government officials were made public. Diaz-Colon later

---

[8] According to Maceira, Diaz-Colon would receive a monthly retainer of $4,000 for the contracts.

told Maceira that Maldonado-Nieves was responsible for releasing the Telegram messages -- presumably from the binder that Diaz-Colon had described -- and said that Maldonado-Nieves had obtained them from his father's phone. The bulk release of chats caused "total chaos" within the administration, as well as "public outroar, crisis, [and] very strong media scrutiny," prompting the resignation of many officials, including, eventually, the governor and Maceira.

In his role as the secretary of public affairs, Maceira saw himself as "the face of the government," and he testified that "every public issue that came out affected me, and that included when the 889 pages were released, I was on those pages." He was "scared" that, in addition to the turmoil already surrounding the government, the additional release of chats would "affect[] [his] professional and personal image further beyond what it had been affected at the moment."

On July 14 -- the day after the bulk disclosure of the chat messages -- Diaz-Colon sent Maceira a private Telegram message reminding him of their "pending" conversation. That same day, Maceira agreed to become a confidential source and witness for the FBI. After another series of messages, Maceira and Diaz-Colon arranged to meet on the evening of July 16 at a restaurant owned by Diaz-Colon in San Juan, Il Postino.

## D.  The Il Postino Conversation

Equipped with FBI-provided recording devices, Maceira met Diaz-Colon as planned at Il Postino.[9]  Maceira described the meeting as "a repetition of the Musa meeting, and all of its content[,] . . . but now it's $300,000 for additional chats not to come out."  Diaz-Colon told Maceira the administration would not be in such difficult straits if the government officials had supported Maldonado, and he warned that Maldonado-Nieves would release more chat messages unless certain conditions were met. The first two demands largely repeated the requirements Diaz-Colon had conveyed at Musa: payment to Maldonado-Nieves of $300,000 and Maceira's assistance in securing the renewal of two government contracts from which Diaz-Colon received a monthly retainer.[10] Diaz-Colon indicated that the $300,000 could be paid with cash or a check directly through him, or the funds could be channeled through a corporation owned by "someone of trust" -- perhaps one belonging to Diaz-Colon, who could pass the payment along to Maldonado-Nieves "little by little" to avoid "any problems."

---

[9] An audio recording of the taped conversation was introduced into evidence at trial, along with a transcript containing the English translation of the conversation.

[10]  Diaz-Colon texted to Maceira the names of the two companies -- Collective Impact and Social Consulting -- while the two men were still at Il Postino.

- 11 -

The third condition -- which replaced the quid pro quo offered at Musa of positive news coverage for government advertising on Maceira's program -- was the payment of sums ranging from $6,000 to $50,000 to "media personalities" whom Diaz-Colon said he controlled. In exchange, these individuals would "stop asking for the governor's resignation" and "adopt[] a different narrative."[11] Diaz-Colon offered to deduct the $50,000 payment from the $300,000 for Maldonado-Nieves.

Diaz-Colon told Maceira that he disagreed with Maldonado-Nieves's demand for $300,000 and that he protested to Maldonado-Nieves that it was "extortion" that he was "not going to do." In Maceira's view, however, Diaz-Colon was "playing both sides; lighting the fire, but on the other side offering to become

---

[11] According to Maceira, Diaz-Colon explained that obtaining favorable coverage for the administration now required payments to the media personalities because "it was a different time" after "chats got leaked, . . . there were protests, . . . people were asking for the governor's resignation." And, Maceira testified, the influencers themselves were "calling protesters to go to the protests and ask for the governor's resignation." Maceira described his understanding of the change in narrative that would follow the payments as follows:

> [The media personalities would] stop attacking the administration, asking for the governor's resignation, et cetera, and adopting instead the narrative that even though they were angry at the expressions in the chat, that they would say, you know what, I was angry, but after seeing all this that is happening, we have to stop asking for his resignation.

the firefighter, obviously, in exchange for money." Maceira testified that he did not believe Diaz-Colon "wasn't going to ask for the money" because "[h]e had already asked me for it" -- both in the earlier meeting at Musa and "[n]ow on July 16th, we had referenced the $300,000 on multiple occasions." Maceira gave the following response, echoing an earlier characterization, when asked by the prosecutor for his understanding of Diaz-Colon's assurance "that he wasn't going to do that":

> [T]o me, it was like gangster-style, saying, I don't want to do it, but he already referenced it in certain occasions. At one point when I was speaking about something else, he brings it up. And even at one point where I say, "Well, then you cannot guarantee that the chats will not come out," he clarifies quickly, "No, no, no, I can," if I abide and give him the $300,000. It was contradictory messages.

After the meeting with Diaz-Colon, Maceira turned over the recording devices to the FBI.[12] Three days later, on July 19, Maceira again met with the FBI, and agents proposed that he make a controlled payment to Diaz-Colon of $20,000 as a strategy for "gathering additional evidence." Maceira declined, explaining at trial that he felt uncomfortable about making such a payment and that he "thought that it wouldn't work" because the amount "wasn't enough."

---

[12] FBI Special Agent López testified that he picked up Maceira after the meeting, retrieved the recording devices, drove Maceira home, and then dropped the devices off at the FBI office.

Meanwhile, between the Il Postino conversation and Maceira's meeting with the FBI on July 19, Maceira and Diaz-Colon had exchanged some Telegram messages referencing the political fallout from the earlier release of the controversial chats, including suggestions from Diaz-Colon about how Maceira should respond to the media. Then, while Maceira was with the FBI agents on July 19 to discuss strategy, Maceira messaged Diaz-Colon: "Bro, these have been difficult days. Thanks for the support." Diaz-Colon responded: "Onward and upwards. Hitting hard without fear." Maceira then messaged back:

> I haven't forgotten. I am trying to do my homework. Next week we will meet to discuss everything, including how we are going to do it now.[13]

At trial, Maceira explained that the reference to his "homework" meant the three requirements Diaz-Colon had conveyed at Il Postino to prevent the release of further chats. Diaz-Colon replied with emojis of a flexed bicep and a heart.

## E. The FBI Meeting with Diaz-Colon

Five days later, on July 26, FBI agents interviewed Diaz-Colon at his home, bringing with them a warrant to seize and search his cell phone. Before executing the warrant, the agents

---

[13] FBI Agent López recalled that, after Maceira declined to make the $20,000 payment, the agents had said, "Let's send [Diaz-Colon] a message so that he knows that we are thinking about giving him the 300,000 that he had requested."

obtained Diaz-Colon's consent to view text messages on his phone between him and Maldonado-Nieves. While holding his phone during the interview, Diaz-Colon occasionally placed the phone on a table before picking it up again and "manipulat[ing]" it. At one point, at the agents' request, Diaz-Colon made a recorded call to Maldonado-Nieves, the contents of which were not introduced into evidence.[14] The agents subsequently executed the search warrant and took the phone with them.

Later that night, Maceira became aware that Telegram messages he had received from Diaz-Colon earlier in the day, as well as earlier messages exchanged by the two men, had disappeared from his phone. Maceira notified the FBI about the deleted

---

[14] According to a transcript of the call submitted as an exhibit to a pretrial defense motion, Diaz-Colon told Maldonado-Nieves that Maceira was willing to pay $300,000 to prevent disclosure of additional messages. Maldonado-Nieves responded that he was not interested in the money and sought only to stop the attacks on his father. This exchange was not in evidence at trial because the district court ruled that the substance of the call needed to be introduced through the testimony of one of the participants, and the defense did not call either Maldonado-Nieves or Diaz-Colon as a witness. We therefore do not consider the contents of the call in assessing the sufficiency of the evidence. See Lockhart v. Nelson, 488 U.S. 33, 41-42 (1988) (stating that a reviewing court must consider the "same quantum of evidence" as the trial court when assessing the sufficiency of the evidence); United States v. Martínez-Hernández, 118 F.4th 72, 80 (1st Cir. 2024) (explaining that the appellate court in reviewing for sufficiency will not consider "evidence that the jury did not hear"). As we shall discuss later, Diaz-Colon challenges the district court's refusal to allow him to introduce into evidence the taped conversation or testimony from López on the substance of the call. See infra Section V.A.

messages and sent the FBI a screenshot of his phone showing a blank screen where messages ordinarily would appear. Text at the top of the screenshot stated that Diaz-Colon "was last seen 4 hours ago" -- indicating that he was active in the chat at that time, which was during the FBI interview at his home.

The FBI later extracted at least some of the deleted Telegram messages from Diaz-Colon's phone, as well as text messages on platforms other than Telegram that were exchanged between Diaz-Colon and Maldonado-Nieves. The messages between Diaz-Colon and Maceira that were introduced into evidence included plans for their meeting at Il Postino, the names of the companies for which Diaz-Colon sought contract assistance, and references to the pair's ongoing discussions. The messages between Diaz-Colon and Maldonado-Nieves included one sent on June 22, 2019 -- the day after Diaz-Colon and Maceira met at Musa -- in which Diaz-Colon wrote: "Bro, as I told you in the afternoon. Nothing has happened yet, the gasoline is still in the container. . . . We are moving forward!" On June 24, the day Maldonado was fired as Treasury Secretary, Diaz-Colon messaged Maldonado-Nieves: "Raulie, where are you? This pile of shit is driving me crazy. We have to act with wisdom." On July 15 -- the day before Diaz-Colon and Maceira met at Il Postino -- Diaz-Colon sent several messages to Maldonado-Nieves saying that it was "important" for them to meet.

**F.   Procedural History**

In January 2021, about eighteen months after the events described above, Diaz-Colon was charged in a federal indictment with three counts: (1) attempted extortion, in violation of 18 U.S.C. § 1951 (Count One), or aiding and abetting that crime, id. § 2; (2) transmitting a threatening communication in interstate or foreign commerce with intent to extort, in violation of 18 U.S.C. § 875(d) (Count Two), or aiding and abetting that crime, id. § 2; and (3) destroying records in a federal investigation, in violation of 18 U.S.C. § 1519 (Count Three).  After a two-week trial in early 2023, a jury found Diaz-Colon guilty on all counts.

Diaz-Colon moved for judgment of acquittal and for a new trial, see Fed. R. Crim. P. 29, 33, arguing that the government's evidence was insufficient to prove any of the charged crimes and, alternatively, that he was entitled to a new trial or dismissal of the indictment because of prosecutorial misconduct, including the presentation of false testimony in violation of his due process rights.  The district court denied both motions in a twenty-six-page opinion and sentenced Diaz-Colon to a term of fifty-one months' imprisonment, to be followed by three years of supervised release.

In this appeal, as noted above, Diaz-Colon challenges his convictions on numerous grounds.  We turn first to his

contention that the government's evidence failed to establish his guilt beyond a reasonable doubt on any of the three counts.

## II.  Sufficiency of the Evidence

Diaz-Colon maintains that his communications with Maceira were not extortionate but, rather, First Amendment-protected political speech in which -- as defense counsel told the jury -- he was merely "letting a friend know that someone else wants to hurt them."  Diaz-Colon points out that the first Telegram message did not demand a payoff or other quid pro quo, and he highlights his assurance to Maceira at Il Postino that he had objected to Maldonado-Nieves's demand for $300,000 because it would amount to extortion.

The evidence Diaz-Colon emphasizes, however, was not the only evidence heard by the jury.  As the district court observed in denying Diaz-Colon's post-trial motions, "defendants seeking acquittal [based on a sufficiency challenge] 'face an uphill battle.'"  Díaz-Colón, 2023 WL 3321488, at *5 (quoting United States v. Pérez-Meléndez, 599 F.3d 31, 40 (1st Cir. 2010)).  In examining the record to determine the adequacy of the government's proof of criminal conduct, "[w]e consider the evidence 'in its totality,' meaning that '[i]ndividual pieces of evidence that might not be enough on their own . . . might add up to tell th[e] tale' of a defendant's guilt beyond a reasonable doubt."  United States v. Guerrero-Narváez, 29 F.4th 1, 9 (1st Cir. 2022) (second

- 18 -

and third alterations and omission in original) (quoting United States v. Guzman-Ortiz, 975 F.3d 43, 54 (1st Cir. 2020)).[15]

As we previously stated in describing our sufficiency inquiry,

> [t]he question is not whether "no verdict other than a guilty verdict could sensibly be reached," but only whether "the guilty verdict finds support in a plausible rendition of the record." To affirm, we need not be satisfied that "the government succeeded in eliminating every possible theory consistent with the defendant's innocence."

United States v. Soler-Montalvo, 44 F.4th 1, 7 (1st Cir. 2022) (citation omitted) (quoting United States v. Seary-Colón, 997 F.3d 1, 12, 14 (1st Cir. 2021)). It is well established that our role does not include "weigh[ing] the evidence or mak[ing] credibility judgments; these tasks are solely within the jury's province." United States v. Serunjogi, 767 F.3d 132, 139 (1st Cir. 2014) (quoting United States v. Hernández, 218 F.3d 58, 64 (1st Cir. 2000)).

Ultimately, then, we must uphold the jury's judgment "unless the evidence is so scant that a rational factfinder could not conclude that the government proved all the essential elements

---

[15] In Guerrero-Narváez, the government was appealing the district court's judgment of acquittal for the defendant. See 29 F.4th at 8-9. The same sufficiency analysis applies in that context as when a defendant is appealing from the district court's refusal to grant such a judgment. See id.; United States v. Santonastaso, 100 F.4th 62, 68 (1st Cir. 2024).

- 19 -

of the charged crime beyond a reasonable doubt." United States v. Vázquez-Soto, 939 F.3d 365, 371 (1st Cir. 2019) (emphasis omitted) (quoting United States v. Rodríguez-Vélez, 597 F.3d 32, 39 (1st Cir. 2010)); see also United States v. Buoi, 84 F.4th 31, 38 (1st Cir. 2023) ("[W]e will reverse only if the verdict is irrational." (alteration in original) (quoting United States v. Connolly, 341 F.3d 16, 22 (1st Cir. 2003))). When assessing the adequacy of the prosecution's proof, "we take the evidence, both direct and circumstantial, in the light most hospitable to the government and draw all reasonable inferences in the government's favor." United States v. Carmona, 103 F.4th 83, 91 (1st Cir. 2024) (quoting United States v. De La Cruz, 835 F.3d 1, 9 (1st Cir. 2016)).

We thus turn to our de novo review of the evidence before the jury on each count. See United States v. Santonastaso, 100 F.4th 62, 68 (1st Cir. 2024) (specifying the de novo standard of appellate review for preserved sufficiency claims).[16]

---

[16] Diaz-Colon argues that the district court erred in denying his motion for a judgment of acquittal based on insufficient evidence under Federal Rule of Criminal Procedure 29 at the conclusion of the government's case and that the court erred post-trial in denying his renewed Rule 29 motion and, alternatively, his request for a new trial pursuant to Rule 33. Our analysis of the adequacy of the evidence applies to both the mid-trial and post-trial motions.

## A.  Count One: Attempted Extortion

Briefly stated, Count One charged Diaz-Colon with attempting, or aiding and abetting an attempt, to extort Maceira in violation of the Hobbs Act.  See 18 U.S.C. §§ 1951(a), 2.[17] Extortion under the Hobbs Act is defined as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."  Id. § 1951(b)(2).  The indictment charged Diaz-Colon with attempted extortion by means of the wrongful use of fear.

In briefing that partially relies on materials not introduced at trial, Diaz-Colon appears to contend that the government's proof on Count One fell short in the following ways: (1) the evidence does not show that he intentionally conveyed a wrongful threat that caused Maceira reasonably to fear economic harm, (2) the evidence does not support a finding that Diaz-Colon aided and abetted an attempt by Maldonado-Nieves to extort Maceira, (3) Diaz-Colon's texts and meetings with Maceira were not a sufficient step toward committing extortion to constitute an

---

[17] Section 1951(a), known as the Hobbs Act, "makes it a felony to 'obstruct[], delay[], or affect[] commerce or the movement of any article or commodity in commerce, by robbery or extortion' or to attempt or conspire to do so."  United States v. Correia, 55 F.4th 12, 29 (1st Cir. 2022) (alterations in original) (quoting the statute).

attempt, and (4) the contract renewals allegedly targeted by Diaz-Colon were not <u>transferable</u> property, as required to support an extortion charge under Supreme Court precedent, <u>see</u> <u>Sekhar</u> v. <u>United States</u>, 570 U.S. 729, 734 (2013). We consider each of these contentions in turn.

### 1. The Fear-Inducing Threat and Intent to Extort

To prove an extortion offense, the government must establish, inter alia, that "the defendant induced someone to part with property" and that the defendant did so "knowingly and willfully . . . by extortionate means." <u>United States</u> v. <u>Cruzado-Laureano</u>, 404 F.3d 470, 480 (1st Cir. 2005). The charge here was for an alleged attempt to extort, and the government therefore needed to prove that Diaz Colon <u>attempted</u> to "induce[] someone to part with property." <u>Id.</u> The Hobbs Act expressly includes "fear" as one "extortionate means" and, "under the Hobbs Act, 'fear' encompasses fear of economic loss, including the loss of business opportunities." <u>United States</u> v. <u>Didonna</u>, 866 F.3d 40, 46 (1st Cir. 2017) (citation modified) (quoting <u>United States</u> v. <u>Cruz-Arroyo</u>, 461 F.3d 69, 74 (1st Cir. 2006)).

To prove that a targeted individual feared a financial or professional loss -- the prosecution's theory here -- the government was required to "show that the victim believed that economic loss would result from his or her failure to comply with the alleged extortionist's terms, and that the circumstances

- 22 -

surrounding this conduct rendered that fear reasonable." United States v. Bucci, 839 F.2d 825, 828 (1st Cir. 1998). The threat itself need not be explicit. See United States v. Rivera Rangel, 396 F.3d 476, 484 n.7 (1st Cir. 2005) (noting that "it is enough if the victim 'understood the defendant's conduct as an implied threat'" (quoting Bucci, 839 F.2d at 828)). Diaz-Colon claims the evidence did not show that Maceira had a reasonable fear of economic harm. He also appears to argue that the evidence more generally failed to show that he had the requisite state of mind to commit -- or, in this instance, to attempt to commit -- extortion.

The record does not support these assertions. First, there was no shortage of evidence on Maceira's fear. As described above, Maceira testified that he was "scared" and "concerned" about the ramifications of Diaz-Colon's original Telegram message -- which threatened that "RAUL'S SON IS GOING TO DESTROY YOU ALL." More specifically, Maceira testified that, after receiving that message, "I was concerned about myself, my reputation, the effect it could have on me, on my family, on my employment, on my employment status after I decided to go back to private practice." Later in his testimony, he reiterated that concern, reporting that, from the time he received the first message through July 26, 2019, he was alarmed that the situation "could result in [his] being unemployed, being unable to find employment here in Puerto Rico,

being unable to be what [he] wanted to be when [he] got out of the government, which was an attorney in the private practice." Maceira explained that he was so worried after he met Diaz-Colon at Musa that he flew to Florida to seek guidance from a former law enforcement official.[18]

Maceira's testimony about his interactions with Diaz-Colon after receiving the original message gave the jury ample basis for also concluding that Maceira's fear was reasonable. At their first meeting, at Musa, Diaz-Colon made the threat concrete by telling Maceira that Maldonado-Nieves possessed the binder of politically damaging messages. Then, at Il Postino -- after more than 889 pages of messages had been published and there was "total chaos" within the administration and a "public outroar" -- Diaz-Colon reminded Maceira that he had "warned [him] at Musa, and if [he] would have listened . . ., [they] wouldn't have been here." Diaz-Colon also indicated in that meeting that Maldonado-Nieves had more such messages. The jury could reasonably infer from this evidence, which was supported by the recording and transcript of the Il Postino conversation,[19] that Diaz-Colon was

---

[18] Maceira testified that he knew he "had just tried to be extorted" and "didn't know how to proceed." He further explained that he "wanted to go to the authorities" but "needed guidance on . . . the process."

[19] Each juror was given a copy of the transcript, and the government played excerpts from the recording during its direct examination of Maceira.

reinforcing the potency of the threat to Maceira, prompting Maceira's reasonable fear that more damage would be done if he failed to comply with the quid-pro-quo demands.

The Il Postino conversation, among other evidence, also provided the jury with a reasonable basis for finding that Diaz-Colon was "knowingly and willfully" attempting to extort Maceira -- contradicting Diaz-Colon's insistence that the original message was merely a political warning. Diaz-Colon repeatedly assured Maceira that, if the specified conditions were met, he could protect Maceira from the harm that would result from public disclosure of the disparaging chat messages. At one point, for example, after the two men discussed payments for positive commentary from media personalities, the transcript contains the following exchange[20]:

> [MACEIRA]: Okay, well, wait, well then, now I have a little more peace of mind. You cannot guarantee to me that the chats will not come out.
> [DIAZ-COLON]: Well, I can guarantee it if I accept to be a part of this fucking crap that this guy asked from me.
> [Pause]
> [MACEIRA]: But how would you do it? With a contract?

---

[20] The transcript itself identifies Maceira as "CHS," standing for "Confidential Human Source," and identifies Diaz-Colon with his initials, "SDC." For ease of reading, we have substituted the names. Other than for the names, the brackets around text appear in the transcript.

[DIAZ-COLON]: He wants cash or a check.  He said cash or a check.  He said the corporation.
[MACEIRA]: Which one?  The one that had a contract with the government?
[DIAZ-COLON]: No.  A corporation where he does not appear.  It's someone of trust.
[MACEIRA]: [Sighs] So, three things. This is crap, motherfucker.  [Laughs]  When I accepted this position, you didn't tell me I would have to deal with this shit.
[DIAZ-COLON]: Damn, that's right.
[Pause]
[MACEIRA]: Okay, so hypothetically, if we would give him the $300,000 bucks--
. . .
[MACEIRA]: --and we would not have to deal with him directly.  Can you manage that?
[DIAZ-COLON]: Yes, yes.  It will not be a problem.  It would not be a problem.
[MACEIRA]:  And with that you can guarantee that the chats will not come out.
[DIAZ-COLON]:  With that, I can guarantee that he will stop being a pain in the ass.[21]

Also during the Il Postino conversation, Diaz-Colon said that, with the previously discussed payments, he could "guarantee" that the media personalities would change the public narrative

---

[21] After some intervening dialogue, Maceira reiterated his "guarantee" question:

> [MACEIRA]: And that would guarantee that the chats will not come out and that he will not fuck with me.
> [DIAZ-COLON]: Of course.  I mean, I mean.  I would have to tell him.  It's not like I already told him.  Because the last time, like I told you, he didn't, he didn't even talk to me about you.

Still later in the conversation, Diaz-Colon told Maceira that "[i]f he accepts those 300,000 like he said to me, I can assure you that he will say -- He will stop it because he said that to me."

favorably for Maceira. The jurors could reasonably understand Diaz-Colon's comments to signify an intention to carry out the quid pro quo he was proposing.

To be sure, there was evidence that would have permitted the jurors to reach a different judgment on the extortion charge. As Diaz-Colon emphasizes, the discussion between the two men at Il Postino included Diaz-Colon's disclaimer that he would not ask for the $300,000 because that was "extortion" that he was "not going to do." Defense counsel also sought to undermine Maceira's credibility by eliciting his acknowledgment that, in his pre-indictment testimony before the grand jury, Maceira did not report that Diaz-Colon had sought the $300,000 payment when the pair met at Musa and that he never approached anyone to obtain the $300,000 or otherwise took steps to comply with Diaz-Colon's demands.

In addition, Maceira acknowledged on cross-examination that Governor Rosselló and his wife asked him to reach out to Diaz-Colon in mid-July 2019 -- i.e., amid the Telegram chat scandal and the alleged extortion scheme -- "because [Diaz-Colon] might have a way to help," and Maceira admitted that he did not know that Diaz-Colon "and a company" had in fact been hired around that time, and paid over $100,000, "to carry out damage control" on behalf of the governor.[22] Through that cross-examination, defense

_____

[22] A copy of an invoice for a $100,000 contract between D.R. Consulting -- a company associated with Diaz-Colon -- and the

counsel presumably sought to show that the governor's willingness to work with Diaz-Colon, and the contract arranged without Maceira's awareness, were facts inconsistent with Maceira's testimony that he had told the governor about Diaz-Colon's threat and demands.[23]

---

Ricardo Rosselló Committee was attached as an exhibit to Diaz-Colon's post-trial Renewal Memorandum for Judgment of Acquittal and Motion for New Trial.  The document, dated July 20, 2019, and covering the period July 19-August 1, 2019, stated that the services provided included "[c]reation of strategy" and "[d]rafting of communications to disseminate."

[23] Defense counsel also asked Maceira if he had told FBI Agent López about the governor's request that he contact Diaz-Colon for help.  That portion of the questioning, including the exchange concerning the contract, was as follows:

> [COUNSEL]: I am asking you a simple question; if you informed Agent Lopez that the governor wanted to reach out to [Diaz-Colon] to see what could be done to fix the administration's image.
> [MACEIRA]: I don't recall if that's what I told them, sir.
> . . .
> [COUNSEL]: Did you ever receive information that Governor Rossello around that time period of July 13, 2019, had actually hired [Diaz-Colon] to carry out damage control?
> [MACEIRA]: No, sir.
> [COUNSEL]: Okay.  Were you ever made aware that [Diaz-Colon] was already getting paid by the Rossello committee for hiring talents and damage control?
> [MACEIRA]: No, sir.
> [COUNSEL]: Were you ever made aware that [Diaz-Colon] and a company had been paid over $100,000 for that damage control contract?
> [MACEIRA asks about the timing]
> [COUNSEL]: July 13, 2019
> [MACEIRA]: No. No, sir.

Defense counsel's closing argument highlighted other facts arguably inconsistent with the prosecution's evidence of attempted extortion. Counsel emphasized that the conversation between the two men at Il Postino showed "they were having a good time," using as an example an excerpt from the transcript in which the pair agreed to share risotto and skirt steak. Their interactions, counsel argued, "totally contradict Maceira's testimony that Sixto [Diaz-Colon] was talking to him like a gangster." The jury also knew that Maceira had refused to offer $20,000 to Diaz-Colon that the FBI would have provided, and defense counsel in closing emphasized that the reason Maceira gave for that refusal in his testimony -- that it was too little -- was not the real reason. Rather, it was "because he knew that [Diaz-Colon]

We note that Maceira's acknowledgment that Governor Rosselló asked him to seek Diaz-Colon's help in responding to the political crisis while the alleged extortion scheme was ongoing arguably could support competing inferences. As defense counsel evidently intended, the jurors might have viewed that testimony to discredit Maceira's claim that he felt threatened by Diaz-Colon or, more generally, they may have questioned Maceira's recounting of events. But the jury also could have reasonably seen the governor's request to Maceira and the consulting contract as measures aimed at deflating the attempted extortion and avoiding the $300,000 payment and other demands. In his brief, Diaz-Colon seemingly attempts to rebut any inference that the governor's interaction with him was done with knowledge of the extortion attempt -- and, for that reason, supported Maceira's testimony -- by citing Rosselló's statement to the FBI in December 2020 that he was unaware of Diaz-Colon's demands. However, Rosselló did not testify at trial, and his FBI interview was not in evidence.

had repeatedly told him that he was not going to participate in any extortion."[24]

As we have explained, however, whether the jury could have reached a different judgment about whether Diaz-Colon was attempting to commit extortion based on the evidence they heard is not the question before us. And, as we have described, the verdict they did reach was amply supported by Maceira's testimony and other evidence. Notably, Diaz-Colon himself described the demand for $300,000 as "extortion" when he claimed to refuse making it, and yet, as Maceira testified, "[h]e had already asked me for it." To the extent Maceira's credibility was at issue, it was the jurors' prerogative to discount the defense attempts to damage it. See, e.g., Soler-Montalvo, 44 F.4th at 8 ("[I]t is not our role to 'decide which witness to credit,' for we must assume that the jury

---

[24] In making this argument, defense counsel pointed out that "[the government's] own evidence showed that [Diaz-Colon and Maldonado-Nieves] were willing to consider little-by-little payments." Counsel further argued:

> So if Sixto [Diaz-Colon] was willing to accept payments little by little, Maceira . . . was given the opportunity by the FBI to establish definitely that Sixto intended to extort. All Maceira had to do is say "Here, Sixto, here is a $20,000 advance payment for the extortion, and we will deal with it little by little" . . . . "Little by little." $20,000 is not a small amount. It is not $300,000, but it certainly fits in with paying little by little.

'credited those witnesses whose testimony lent support to the verdict.'" (citation modified)).

In sum, the evidence was sufficient for the jury to find that Diaz-Colon made a threat designed to induce fear in Maceira about the dire consequences of failing to meet the specified conditions for preventing release of the chats, in an attempt to "obtain[] . . . property from [Maceira], with his consent."  18 U.S.C. § 1951(b)(2).[25]

### 2. Aiding and Abetting

Diaz-Colon cites his recorded July 26 phone conversation with Maldonado-Nieves, in which Maldonado-Nieves said he was seeking revenge, not money, as proof that he was not acting at Maldonado-Nieves's behest in seeking the $300,000 payment. Accordingly, he insists, the evidence failed to support a finding that he aided and abetted Maldonado-Nieves in violating § 1951(a) and, because the jury's finding of guilt on Count One might have been premised on an aiding-and-abetting theory, that verdict must be vacated.  But, as we have explained, the content of the July 26

---

[25] A threat of economic harm is not unlawful under the Hobbs Act if the person making the threat has a "claim of right to [the] property" being demanded.  United States v. Burhoe, 871 F.3d 1, 9 (1st Cir. 2017) (quoting United States v. Sturm, 870 F.2d 769, 773-74 (1st Cir. 1989)).  Diaz-Colon does not argue that he had a right to the funds at issue here.  Nor does he challenge on appeal the sufficiency of the government's proof that "the extortionate transaction affected interstate commerce," another element of a Hobbs Act extortion offense.  Cruzado-Laureano, 404 F.3d at 480.

phone call was not introduced at trial. Moreover, even if the conversation had been admitted, it would have been consistent with other evidence allowing the jury to find that -- at least by the time of the call, if not originally -- Diaz-Colon was attempting to obtain the money for himself. After all, the arrangements discussed at Il Postino provided for the $300,000 to be paid directly to Diaz-Colon for transfer to Maldonado-Nieves, and the request for the contract renewals is evidence that Diaz-Colon was, at least in part, advancing his own interests.

The indictment charged Diaz-Colon as both a principal and as an aider and abettor, and the prosecution was not limited to only one of those theories. Indeed, even if the indictment had not expressly alleged violation of the aiding and abetting statute, 18 U.S.C. § 2, that alternative theory of culpability would have been properly argued to the jury. See, e.g., United States v. Vázquez-Castro, 640 F.3d 19, 25 (1st Cir. 2011) ("Aiding and abetting is an alternative charge in every count, whether explicit or implicit." (citation modified)); see also Rojas-Tapia v. United States, 130 F.4th 241, 254 (1st Cir. 2025) (explaining that the aiding and abetting statute, 18 U.S.C. § 2, "identifies a theory of liability for the commission of every federal offense to which [it] applies"). The allegations in the indictment track the evidence described above in identifying Maldonado-Nieves as the source of the controversial chats with a motivation for revenge.

But they permit an inference that Diaz-Colon's attempt to extract financial concessions from Maceira was for his own benefit rather than to abet Maldonado-Nieves's attempt to do so.[26]  In closing argument, defense counsel invoked the revenge theory to challenge the prosecution's depiction of Diaz-Colon's role in the events surrounding the release of the Telegram chats, asserting that "[t]his is a case about revenge, not extortion" and stating that Maldonado-Nieves "got his revenge without being paid a penny."  In its rebuttal argument, the government responded to that assertion: "[T]he Defense argued this morning that this is a case about revenge.  It's not."  Rather, the government emphasized, "[t]his is a case about the defendant, Sixto Jorge Diaz-Colon, taking advantage of someone's anger to get money."

Because committing the crime as a principal and aiding and abetting someone else's criminal activity are both theories of liability that could support a finding of guilt on Count One, it does not matter whether the jury's verdict was premised on Diaz-Colon's attempted extortion for his own benefit or as an aider and abettor of Maldonado-Nieves.  Indeed, it does not matter for sufficiency purposes if all jurors reached the same conclusion

---

[26] The indictment alleges, inter alia, that Maldonado-Nieves "intended to 'burn down Puerto Rico' by releasing the[] Telegram messages unless [he] received approximately $300,000" and that "DIAZ COLON would receive the payment on behalf of" Maldonado-Nieves through a corporation that DIAZ COLON owned that did not have any contracts with the government."

about his role in the attempted extortion so long as they each made factual findings that support guilt beyond a reasonable doubt. See Schad v. Arizona, 501 U.S. 624, 631-32 (1991) (plurality opinion), abrogation on other grounds recognized by, Edwards v. Vannoy, 593 U.S. 255, 265 & n.4 (2021); United States v. Ackell, 907 F.3d 67, 79 (1st Cir. 2018). As we have described, the evidence is sufficient to support either theory.

At one point in his brief, Diaz-Colon appears to argue that the jury verdict on Count One cannot stand because, in his view, the count wrongly charged both attempted extortion and aiding and abetting "the completed crime" of extortion -- a contention seemingly based on the belief that the "aiding and abetting offense . . . necessarily consists of the commission of the offense."[27] But if that is his argument, Diaz-Colon misunderstands the indictment, the evidence presented at trial, and the law. Diaz-Colon was charged in Count One with attempted extortion and with aiding and abetting that crime -- i.e., with aiding and abetting "the completed crime" of attempted extortion. The government did not suggest otherwise in presenting its case, and, as the government points out, a defendant may be found guilty of

---

[27] Diaz-Colon voiced this perspective to the district court in the context of asking that the verdict form contain a separate reference to the aiding-and-abetting theory.

aiding and abetting an attempt crime.  See, e.g., United States v.

Rodríguez, 215 F.3d 110, 116-17 (1st Cir. 2000).[28]

In sum, Diaz-Colon's culpability for attempted extortion

is the same whether he acted as a principal or as an aider and

abettor.  The validity of the jury's guilty verdict thus does not

depend on whom the jurors viewed as the instigator of the extortion

attempt.  So long as each juror found that Diaz-Colon was using a

wrongful threat in attempting to induce Maceira to turn over

property out of fear of economic harm, he would be guilty of the

crime regardless of whether he was the primary extorter or merely

the front man for Maldonado-Nieves.

### 3. The Proof of Attempt

To prove an attempt to commit a federal crime, the

government must show that the defendant "'inten[ded] to commit the

substantive offense' and took 'a substantial step towards its

---

[28] In the section of his brief addressing instructions related to Count One, Diaz Colon also states that "an attempt is not a lesser-included offense of the completed crime" and that "[a]n indictment charging attempt and the completed crime in the same count is duplicitous."  See United States v. Pontz, 132 F.4th 10, 27 (1st Cir. 2025) (explaining that the bar against duplicitous counts, which "join[] in a single count two or more distinct offenses," "is meant to ensure that defendants receive notice of the crimes with which they are charged and that juries convict only when they are unanimous as to each count" (citation modified)).  Accordingly, Diaz-Colon argues, "[t]he [g]overnment should have been required to elect a charge on which it was proceeding, or the [c]ourt fashion remedial jury instructions." However, as stated above, Count One alleged only attempted extortion and not a completed extortion.

commission.'" Soler-Montalvo, 44 F.4th at 8 (alteration in original) (quoting United States v. Berk, 652 F.3d 132, 140 (1st Cir. 2011)). We have described "[a] substantial step toward commission of an offense [a]s 'less than what is necessary to complete the substantive crime, but more than "mere preparation."'" United States v. Pérez-Rodríguez, 13 F.4th 1, 13 (1st Cir. 2021) (quoting Berk, 652 F.3d at 140); see also, e.g., United States v. Resendiz-Ponce, 549 U.S. 102, 107 (2007) ("As was true at common law, the mere intent to violate a federal criminal statute is not punishable as an attempt unless it is also accompanied by significant conduct."). Even if behavior could be compatible with innocence, it may be "punishable as an attempt" if it is "necessary to the consummation of the crime and . . . of such a nature that a reasonable observer, viewing [the behavior] in context[,] could conclude beyond a reasonable doubt that it was undertaken in accordance with a design to violate the statute." United States v. Rivera-Sola, 713 F.2d 866, 869-70 (1st Cir. 1983) (quoting United States v. Manley, 632 F.2d 978, 987-88 (2d Cir. 1980)).

The evidence before the jury in this case readily suffices to establish an attempt by Diaz-Colon to violate § 1951(a). The extortionate conduct alleged in Count One is the use of a wrongful threat to Maceira in an attempt to induce him to turn over property to which Diaz-Ortiz was not entitled in exchange

for protection from professional and economic harm. Diaz-Colon not only communicated the threat, but he also met twice with Maceira to present the terms of the deal and moved the plan forward between the meetings by exchanging messages with Maceira. At Il Postino, he specified the ways in which the $300,000 could be transferred and texted to Maceira the names of the two companies targeted for contract renewals. In that meeting, Diaz-Colon also said he could tell Maldonado-Nieves to accept $250,000, leaving the other $50,000 for the highest-priced influencer, so that Maceira did not "have to get 350." In response, Maceira said, "[A]nd that way you can guarantee both things," to which Diaz-Colon replied, "Exactly. Exactly."

Indeed, the jury could have found that Diaz-Colon took all necessary steps to extort Maceira and failed to complete the substantive crime only because Maceira went to the FBI instead of complying with Diaz-Colon's demands. It was therefore reasonable for the jury to conclude that Diaz-Colon attempted to extort Maceira (or aided Maldonado-Nieves in doing so). See United States v. Turner, 501 F.3d 59, 68 (1st Cir. 2007) ("While 'mere preparation' does not constitute a substantial step, a defendant 'does not have to get very far along the line toward ultimate commission of the object crime in order to commit the attempt offense.'" (quoting United States v. Doyon, 194 F.3d 207, 211 (1st Cir. 1999))).

### 4. Transferable Property

In Sekhar, the Supreme Court held that, to support a conviction for Hobbs Act extortion, the property extorted must be "transferable -- that is, capable of passing from one person to another." 570 U.S. at 734 (emphasis omitted). The defendant's conviction in Sekhar was based on his demand that the general counsel for the New York State Comptroller recommend an investment in exchange for the defendant's withholding disclosure of the general counsel's extramarital affair. See id. at 731. The Court held that, because the recommendation was not property that could be obtained by the defendant, the demand amounted to "coercion, not extortion." Id. at 738.

Diaz-Colon argues that the Collective Impact and Social Consulting contracts were not transferable property within the meaning of the Hobbs Act. He claims that the contracts are akin to the sought-after recommendation in Sekhar and, hence, the evidence here similarly does not support his conviction for extortion. This analogy, however, is flawed. Although Diaz-Colon asked Maceira to secure renewal of the consulting contracts, the property targeted by the extortionate threat was the plainly transferable funds that the consulting companies expected to obtain from the contracts in question. See United States v. Brissette, 919 F.3d 670, 678 (1st Cir. 2019) (stating that "a defendant may 'acqui[re]' property within the meaning of Sekhar by

directing its transfer from the victim to a party of his choosing, notwithstanding that he does not otherwise personally benefit from the transfer" (alteration in original)).

In any event, as the district court observed, Diaz-Colon's extortion conviction does not depend on the consulting contracts. See Díaz-Colón, 2023 WL 3321488, at *6. The government's evidence of the alleged attempt to obtain property through extortion most prominently and explicitly featured the demand for $300,000. That evidence included Diaz-Colon's recorded explanation at the Il Postino meeting that the payment could be made by "cash or a check" through "[a] corporation where [Maldonado-Nieves] does not appear."[29] Hence, even if Diaz-Colon's challenge to the government's reliance on the contract renewals had merit, any such error would certainly be harmless. We see no possibility that the jurors would have relied solely on that alleged component of the extortion attempt in finding Diaz-Colon

---

[29] As previously noted, Diaz-Colon repeatedly mentioned the $300,000 at the Il Postino meeting and stated the "cash or a check" options twice. He also referred to the $300,000 demand when telling Maceira about an exchange he had with Maldonado-Nieves that Diaz-Colon acknowledged sounded "[a]s if this were the . . . Corleone Mafia." During that exchange, after Maldonado-Nieves complained about "how they screwed my dad over," Diaz-Colon quoted him as saying, "[L]et's just change the subject because it will not be 300,000 . . . [i]t will be a million." Diaz-Colon reported to Maceira that he told Maldonado-Nieves he was "crazy" and "[i]t ain't going to happen," and Diaz-Colon also assured Maceira that "the million dollar thing[,] he is saying that sarcastically."

- 39 -

guilty on Count One.  See, e.g., United States v. Sasso, 695 F.3d 25, 29 (1st Cir. 2012) (describing the "two barometers for measuring harmless error in a criminal case," with "[t]he stricter standard, applicable mainly to issues of constitutional dimension, requir[ing] the government to prove beyond a reasonable doubt that the error did not influence the verdict").

***

We thus conclude that sufficient evidence supported the jury's finding that Diaz-Colon committed the crime of attempted extortion as charged in Count One of the indictment.

## B.  Count Two: Interstate Communication of an Extortion Threat

Count Two charged Diaz-Colon with violating 18 U.S.C. § 875(d), which, in relevant part, criminalizes transmitting through interstate or foreign commerce a communication that contains a "threat to injure the property or reputation of the addressee or of another" with "intent to extort . . . any money or other thing of value."  18 U.S.C. § 875(d).  The government states in its brief that it accepts for purposes of this appeal that "the 'intent to extort' language in § 875(d) incorporates 'the traditional concept of extortion, which includes an element of wrongfulness,'" Appellee's Br. at 43 (quoting United States v. Jackson, 180 F.3d 55, 70 (2d Cir. 1999)), and we do likewise.  A threat communicated "with intent to extort," 18 U.S.C. § 875(d), is "inherently wrongful and its transmission in interstate

- 40 -

commerce is prohibited by § 875(d)" when the threatener "seeks money or property to which [he] does not have, and cannot reasonably believe [he] has, a claim of right, or where the threat has no nexus to a plausible claim of right." Jackson, 180 F.3d at 71; cf. United States v. Burhoe, 871 F.3d 1, 9 (1st Cir. 2017) ("[W]e have held that 'the use of legitimate economic threats' to procure property is 'wrongful' under the Hobbs Act 'only if the defendant has no claim of right to that property' and knew as much." (quoting United States v. Sturm, 870 F.2d 769, 773 (1st Cir. 1989))).

The communication at issue in Count Two is Diaz-Colon's original chat sent on June 20, which explicitly presented a threat to the reputation of Maceira and other government officials, who, he claimed, would be "DESTROY[ED]" by Maldonado-Nieves's "STRONG EVIDENCE." The government introduced evidence that Telegram messages travel through interstate and foreign commerce, and Diaz-Colon offers no challenge to that evidence. Diaz-Colon instead argues that the June 20 message contained no extortionate demand for money "or anything else of value" and thus cannot satisfy the requirement under § 875(d) that the communicated threat be wrongful. He insists that, rather than a "true threat" of extortion,[30] the message "solely consists of legitimate

---

[30] We have defined a "true threat" as "one that a reasonable recipient familiar with the context of the communication would

- 41 -

political speech" warning of "potential political damage to the Rossello administration" and, accordingly, is protected by the First Amendment. In other words, Diaz-Colon argues that the evidence failed to show that he had the "intent to extort" required by the statute. 18 U.S.C. § 875(d).

The jurors, however, reasonably could have taken a different view of Diaz-Colon's motivation when they considered the message -- to use Diaz-Colon's own words -- "in its situational context." As the government points out, § 875(d) does not state that the demand for "money or other thing of value" must be contained within the threatening message, and a finding of extortionate intent may reasonably be supported by evidence beyond the contents of the communication. That finding is the prerogative of the jury. See, e.g., Evans v. United States, 504 U.S. 255, 274 (1992) (Kennedy, J., concurring in part and concurring in the judgment) ("The criminal law in the usual course concerns itself with motives and consequences, not formalities. And the trier of fact is quite capable of deciding the intent with which words were spoken or actions taken . . . ."); McCormick v. United States, 500

---

find threatening." United States v. Nishnianidze, 342 F.3d 6, 15 (1st Cir. 2003). In explaining "true threats" of violence, the Supreme Court observed that "[t]he 'true' in that term distinguishes what is at issue from jests, 'hyperbole,' or other statements that when taken in context do not convey a real possibility that violence will follow." Counterman v. Colorado, 600 U.S. 66, 74 (2023).

U.S. 257, 270 (1991) (observing in a Hobbs Act case that "[i]t goes without saying that matters of intent are for the jury to consider").

Here, although Diaz-Colon's threatening message did not explicitly demand money or other benefits, Maceira was alarmed by what the message might be conveying implicitly. He thus asked to meet with Diaz-Colon to obtain "specifics about what the threat meant." The jury could reasonably infer from the pair's subsequent interactions, including the conversations at Musa and Il Postino, that Diaz-Colon sent the message on June 20 with an intent to extort Maceira for the $300,000 and other financial benefits later specified -- or with an intent to assist Maldonado-Nieves in doing so[31] -- and thus that the communication satisfied the elements of § 875(d). If so, the message would not be protected by the First

_____

[31] Although Diaz-Colon asserts that "[e]vidence of aiding and abetting is nonexistent" with respect to Count Two, Maceira testified that -- according to Diaz-Colon -- Maldonado-Nieves was with Diaz-Colon when he sent the June 20 message. The transcript of the Il Postino meeting similarly indicates that the two men were together on June 20. Diaz-Colon told Maceira that Maldonado-Nieves was "right next to me and I text you." The exchange then continued:

> [DIAZ-COLON]: He was next to me. And I started to tell you, bro, this, you know. . . If you felt it as a threat, like you said to me.
> [MACEIRA]: Yes, yes.
> [DIAZ-COLON]: I was next to him. What I-- Perhaps I might have been transmitting to you his threat.

Amendment. See, e.g., United States v. Sayer, 748 F.3d 425, 433-34 (1st Cir. 2014) ("Speech integral to criminal conduct is now recognized as a 'long-established category of unprotected speech.'" (quoting United States v. Stevens, 559 U.S. 460, 471 (2010))); see also United States v. Coss, 677 F.3d 278, 289 (6th Cir. 2012) (stating that "18 U.S.C. § 875(d) criminalizes, in a clear and precise manner, extortionate threats, which are true threats, and therefore not protected speech"); cf. United States v. Hutson, 843 F.2d 1232, 1235 (9th Cir. 1988) (addressing a similar statute, 18 U.S.C. § 876, and stating that "[t]he 'intent to extort' requirement . . . guarantees that the statute reaches only extortionate speech, which is undoubtedly within the government's power to prohibit").

The evidence was therefore sufficient to support the jury's finding of guilt on Count Two.

## C. Count Three: Destruction of Records

Briefly described, Count Three charged Diaz-Colon with destroying records -- the series of Telegram chats between him and Maceira that disappeared from Maceira's phone -- with the intent to impede a federal investigation, in violation of 18 U.S.C. § 1519. The government claims that Diaz-Colon knowingly deleted the Telegram messages with the intent to prevent federal authorities from using them as evidence in the extortion investigation. On appeal, Diaz-Colon seems to argue that the

government failed to prove both his knowledge of, and intent to impede, an investigation when he deleted the messages. We disagree. The evidence before the jury was sufficient to show beyond a reasonable doubt that Diaz-Colon deleted the messages with the requisite knowledge and intent.

The government's evidence permitted the jury to infer that Diaz-Colon deleted the messages while the FBI agents were at his home on July 26. As described above, that evidence included the screenshot from Maceira's phone showing blank space where messages evidently had appeared earlier, along with text on the screenshot indicating that Diaz-Colon had been active on his phone during the interview timeframe. Maceira testified that Diaz-Colon must have erased those Telegram chat messages because he (Maceira) -- the only other participant in the chats -- had not done so. In addition, FBI Agent López testified that Diaz-Colon repeatedly "manipulate[d]" his phone while being interviewed. The timing of the deletion was thus amply linked to the FBI's investigation. The jury also could reasonably infer that Diaz-Colon decided to erase the messages because, as the FBI interview progressed, he realized that the FBI was investigating his interactions with Maceira and Maldonado-Nieves -- particularly after the agents asked him to place a recorded phone call to Maldonado-Nieves.

On appeal, Diaz-Colon attempts to rebut the facts and inferences supporting the jury's guilty verdict, arguing that

López's testimony about his manipulation of the phone is "incredible, implausible, and unbelievable" because the FBI had a warrant to seize the phone and would not have allowed Diaz-Colon to tamper with it. Diaz-Colon also points out that he willingly gave agents access to his phone and password when they first arrived for the interview, allowing López "to observe [the phone's] contents and ask questions about certain text messages." According to Diaz-Colon, his compliance "establishes that [he] had nothing to hide."

These assertions, however, largely challenge the jurors' assessment of López's credibility, which is not a viable approach on appeal. As we have made clear, it is not our role to second-guess the jury's credibility judgments. See, e.g., Carmona, 103 F.4th at 93 ("We have stated that 'a defendant cannot win a sufficiency-of-the-evidence challenge by claiming . . . the witnesses against him were not credible.'" (omission in original) (quoting United States v. Maldonado-Peña, 4 F.4th 1, 54 (1st Cir. 2021))). Moreover, the jurors would necessarily view López's testimony about what transpired during the FBI interview against the backdrop of the other evidence in the case -- including Maceira's testimony and the timed screenshot apparently showing the deletion of messages.

The jury plainly heard sufficient evidence that Diaz-Colon deleted the messages and that he did so to impede the

FBI's ability to investigate whether his interactions with Maceira and Maldonado-Nieves constituted an attempt to extort Maceira.

### III. Variance

Diaz-Colon claims that a prejudicial variance occurred at trial because the indictment alleged that he attempted to extort the $300,000 for Maldonado-Nieves, but the evidence presented by the government improperly and confusingly suggested that he could be found guilty for seeking the money for himself or for committing crimes other than the ones charged. In unsuccessfully seeking a mistrial in the district court, Diaz-Colon's counsel argued that the evidence created "several variances," citing testimony concerning Diaz-Colon's debts and -- to use counsel's word -- "kickbacks" in connection with government contracts.

A variance occurs when there is "a material factual difference between the crime charged in the indictment and the crime proved at trial." United States v. Rodríguez-Milián, 820 F.3d 26, 33 (1st Cir. 2016). Even when there is a variance, reversal is not required "unless 'it affects the defendant's substantial rights, i.e., the right to have knowledge of the charge sufficient to prepare an effective defense and avoid surprise at trial, and the right to prevent a second prosecution for the same offense.'" United States v. Katana, 93 F.4th 521, 530 (1st Cir. 2024) (quoting United States v. Vega-Martínez, 949 F.3d 43, 51

(1st Cir. 2020)).  We review a preserved variance claim de novo. Id.

The record belies Diaz-Colon's variance claim.  As the government points out, the indictment does not allege that the demand for $300,000 was necessarily for the benefit of Maldonado-Nieves.  Rather, in setting forth the facts underlying the extortion charge, the indictment describes the conversation between Maceira and Diaz-Colon at Il Postino in which Diaz-Colon warned that Maldonado-Nieves wanted "approximately $300,000" to withhold release of the controversial chat messages.  The indictment further reports that Diaz-Colon said he "would receive the payment on behalf of [Maldonado-Nieves]."  Neither of these allegations about what Diaz-Colon told Maceira excludes the theory that Diaz-Colon was using Maldonado-Nieves's anger at the Rosselló administration for his own financial benefit -- i.e., as noted earlier, the language of the indictment is consistent with the possibility that Diaz-Colon saw an opportunity to extort Maceira for a substantial sum for himself when Maldonado-Nieves told him about the damaging chat messages he wanted to release.  See supra Section II.B.2.

The variance claim premised on who would benefit from the $300,000 fails for other reasons as well.  As discussed above, Count One charged Diaz-Colon with attempted extortion as either a principal or aider and abettor.  No variance occurred when the

government presented evidence that would support either theory. Moreover, to prove Hobbs Act extortion, the government could establish that Diaz-Colon sought to benefit either himself or Maldonado-Nieves. See Brissette, 919 F.3d at 678-80 (holding that the "obtaining of property" requirement for Hobbs Act extortion in 18 U.S.C. § 1951(b)(2) can be satisfied in "circumstances in which the defendant is alleged to have directed the transfer of property to a third party" without "proof that the defendant received a 'personal benefit' from such a transfer").

Nor do we see error in the admission of the specific evidence that Diaz-Colon challenges as irrelevant to the charged crimes and unfairly prejudicial. The "kickback" evidence he highlights, which he appears to challenge as relevant only to a different crime, refers to his receipt of retainers from the government contracts whose renewal he sought with Maceira's help. Even if those alleged payments could support prosecution for a different crime -- and we do not say they do -- the government is not obliged to bring all possible criminal charges supported by its investigation. See Bordenkircher v. Hayes, 434 U.S. 357, 364 (1978) ("[S]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion."). The evidence was plainly also relevant to show

that Diaz-Colon was trying to extract financial benefits from Maceira in exchange for protection from the threatened harm of professional and economic ruin.

Diaz-Colon's variance challenge to the evidence concerning his financial condition is similarly unavailing. Agent López testified that the FBI's first attempt to interview Diaz-Colon on the morning of July 26 was unsuccessful because the agents received no response when they knocked on his door. According to López, when they returned later in the day, Diaz-Colon explained that he had instructed his wife not to answer the door that morning because he believed the agents were either from the Internal Revenue Service concerning his tax debt or "someone who was going to seize [his] apartment because [he was] also delinquent on [his] payments." The government subsequently focused directly on Diaz-Colon's financial circumstances, asking López if he had received information about Diaz-Colon's debts in June and July 2019. López answered affirmatively, and the government then introduced evidence of Diaz-Colon's past-due mortgage payment and the amount owed on his car lease.

Like the evidence of retainers from the government contracts, this evidence about Diaz-Colon's financial strain is relevant to his willingness to participate in an alleged attempt to extort Maceira. Although Diaz-Colon's motivation to benefit himself was unnecessary to prove the extortion attempt -- as

detailed above -- evidence of his financial need was nonetheless relevant to the jury's determination of whether Diaz-Colon was committing that crime or, as he claimed, merely warning an associate about a threat from someone else.

We thus find no merit in Diaz-Colon's claim that a prejudicial variance tainted the jury's guilty verdicts.[32]

## IV. Prosecutorial Misconduct

Diaz-Colon asserts two primary ways in which he contends the government committed prejudicial misconduct that entitles him to dismissal of the indictment or a new trial: (1) by suborning perjury before the grand jury and at trial, principally from Maceira,[33] and (2) by misrepresenting the condition of the

---

[32] In the variance section of his appellate brief, Diaz-Colon complains that the district court improperly ruled inadmissible certain documents related to his consulting company that he should have been able to use for impeachment. As the government points out, however, the court order cited by Diaz-Colon states that the admissibility of the documents "will be determined in the context of trial." Diaz-Colon does not cite any rejection at trial of a renewed attempt to admit the documents or explain how the documents would have bolstered his variance contention. We therefore do not address this undeveloped argument. See, e.g., United States v. Perez-Segura, 126 F.4th 784, 788 (1st Cir. 2025); United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

[33] Diaz-Colon also makes an undeveloped claim of perjury based on differences between the trial testimony of Lydmarie Torres, the president of one of the consulting companies whose contracts Diaz-Colon discussed with Maceira, and what the grand jury transcript showed she stated there. The trial testimony concerned whether Diaz-Colon had submitted an invoice for consulting work for Torres's company, Collective Impact. At trial, Torres acknowledged that the grand jury transcript shows that she said she received an invoice from him, but at trial she said she did

recording Maceira made at the Musa meeting and, relatedly, failing to provide an enhanced version and transcript of the recorded conversation in violation of its obligations under Brady v. Maryland, 373 U.S. 83 (1963).[34]

_____

not. Although Diaz-Colon asserts that Torres "admitted [at trial to] having perjured herself before the grand jury on instructions of the case agents," the testimony he cites includes no such admission. During cross-examination at trial, Torres answered, "[Y]es" when asked if she had met "with the agents or prosecutors to prepare for [her] testimony." Defense counsel then asked if, "during that preparation, that representation that [Diaz-Colon] had not given an invoice was established." She answered, "Correct." Diaz-Colon fails to explain how that testimony amounts to an admission of government-sponsored perjury before the grand jury -- or at trial. Nor does he identify any prejudice from the asserted inconsistency in Torres's testimony -- which the jury knew about from the cross-examination -- and his claim is doomed on that basis as well. See United States v. Reyes-Echevarría, 345 F.3d 1, 4 (1st Cir. 2003) ("We review any challenges based on prosecutorial misconduct before the grand jury under a harmless-error standard.").

[34] Diaz-Colon also asserts that the government made a "purposeful misrepresentation" in failing to clarify Maldonado-Nieves's grand jury testimony about the call Diaz-Colon made to him on July 26, 2019, at the behest of the FBI. According to Diaz-Colon, without citation to the grand jury transcript, Maldonado-Nieves was asked "if Diaz-Colon had ever made to him an extortionate demand," and he responded by mentioning that call. Diaz-Colon argues that the government should have made clear that the FBI instigated the call, and its failure to do so "led the grand jury to indict Diaz-Colon and constitutes unethical behavior and prosecutorial misconduct."

The government makes the well-taken point that Diaz-Colon did not raise this argument before the district court and that plain-error review therefore applies. See, e.g., United States v. Matta-Quiñones, 140 F.4th 1, 12 (1st Cir. 2025). Regardless of the standard of review, however, we are not persuaded that any possible misunderstanding of the FBI's role in initiating the phone call to Maldonado-Nieves on July 26 "substantially influenced the grand jury's decision to indict," nor do we have "grave doubt that

- 52 -

## A. District Court Decision

The district court rejected Diaz-Colon's varied claims of prosecutorial misconduct as "[f]rivolous," observing that Diaz-Colon "conflates prosecutorial misconduct with commonplace evidentiary disputes and differences of opinion." Díaz-Colón, 2023 WL 3321488, at *9.[35] The court specifically took issue with Diaz-Colon's reliance, in accusing the government of suborning perjury, on the discrepancy between Maceira's trial testimony that he told Governor Rosselló about Diaz-Colon's threatening message and the governor's statement to the FBI that he did not know about the threat. The court noted that "[w]itness recollections vary, and conflicting evidence is offered at nearly every trial," which is "why juries are empaneled to resolve factual inconsistencies." Id. The court also chastised Diaz-Colon for incorrectly claiming that, in a particular email to defense counsel, a prosecutor had characterized the Musa recording made by Maceira as inaudible, see

---

the decision to indict was free from the substantial influence" of misconduct. Reyes-Echevarría, 345 F.3d at 4. We note that the indictment focused on Diaz-Colon's interactions with Maceira, and it alleged conduct that occurred between June 20 and July 19, 2019 -- before the phone call. See also id. ("All but the most serious errors before the grand jury are rendered harmless by a conviction at trial.").

[35] The district court also rejected Diaz-Colon's claim that the FBI improperly failed to provide Miranda warnings and inform him that he was an investigative target when the agents interviewed him at his home. See Diaz-Colon, 2023 WL 3321488, at *10. Diaz-Colon does not reiterate that contention on appeal and we therefore do not further address it.

id. -- although the court was mistaken on that point. The prosecutor had, in fact, referred to the "inaudibility" of the recording in a different email message than the one cited by the court.

## B. Standard of Review

We review for abuse of discretion both the district court's refusal to dismiss the indictment based on prosecutorial misconduct, see United States v. Jackson, 58 F.4th 541, 554 (1st Cir. 2023), and its denial of Diaz-Colon's motion for new trial, see United States v. Tucker, 61 F.4th 194, 206-07 (1st Cir. 2023). As we shall explain, neither of the district court's decisions to reject forms of relief that are granted only "sparingly" can be characterized as beyond its considerable discretion. Id. at 207 (quoting United States v. Laureano-Salgado, 933 F.3d 20, 29 (1st Cir. 2019), referring to the grant of a new trial); see also Jackson, 58 F.4th at 554 (noting the high bar for showing that prosecutorial misconduct warrants dismissing an indictment, i.e., that "the violation substantially influenced the grand jury's decision to indict, or [that] there is grave doubt that the decision to indict was free from the substantial influence of such violations" (alteration in original) (quoting Bank of N.S. v. United States, 487 U.S. 250, 256 (1988))).

- 54 -

## C. Discussion

As noted, Diaz-Colon's allegations of misconduct primarily involve the government's behavior concerning Maceira's recording of the Musa meeting and Maceira's testimony about the conversation that took place at that meeting. Diaz-Colon claims that the recording was essential for his defense because, as revealed by a transcript of the meeting he produced post-trial, the recording contains no reference to a request for $300,000. He views that omission as powerful evidence that he made no such demand and, as discussed below, that the government suborned perjurious testimony from Maceira at trial. We start with Diaz-Colon's allegations about the government's pretrial handling of the recording because that claim of misconduct informs our discussion of Maceira's testimony.

### 1. The Government's Handling of the Musa Recording

It is undisputed that the government gave the defense a copy of the Musa recording in early June 2021, more than nineteen months before the start of trial in late January 2023. Shortly before trial, defense counsel asked the government for a transcript and translation of the conversation recorded at Musa and, after being told none existed "[d]ue to the inaudibility of the recording," defense counsel asked if the government had attempted to enhance the recording. The government responded that no enhancement had been made and advised counsel that the audio file

that the government provided in 2021 would be accessible "using nearly any commercially available digital audio playe[r]." The government also offered counsel the opportunity to review the file at the FBI's office.

Diaz-Colon appears to contend that the government intentionally deceived him into believing the recording was entirely inaudible, and he complains that the government relied on that false characterization to justify its failure to provide him with a transcript and translation. He also suggests that the government must have obtained and withheld an enhanced version of the recording in violation of its obligations under Brady v. Maryland to provide the defense with all exculpatory and impeachment evidence within its possession. See 373 U.S. at 87; Giglio v. United States, 405 U.S. 150, 154 (1972) (extending Brady to impeachment evidence). After reviewing the record, however, we find no basis for concluding that the district court abused its discretion in rejecting Diaz-Colon's Brady-related misconduct claim.

Diaz-Colon's Brady argument rests in substantial part on an asserted inconsistency between the trial testimony of FBI Agent López, who said the Musa recording was audible, and the pre-trial email message from a prosecutor stating that no transcript was produced because of the recording's "inaudibility." The inconsistency here is debatable. As Diaz-Colon acknowledges based

on the enhanced recording and transcript that he procured himself,[36] the recording is only "partially audible." Indeed, his transcript reflects numerous "[u]nintelligible" comments throughout the conversation. At one point, the transcript notes that "voices are inaudible for almost three minutes."[37] Moreover, the recording and transcript end without any parting comments that would signify that Maceira and Diaz-Colon had concluded their

---

[36] In a sidebar during cross-examination of Agent López, defense counsel stated that, after the government reported that the tape was inaudible, the defense consulted an expert, discovered that the "tape can be heard clearly," and sent it "to be transcribed and translated." Counsel reported that at that time -- i.e., on the sixth day of trial -- "[i]t's in the process of being done."

[37] The lengthy inaudible segment was followed by an exchange in which Maceira referred to "everything you told me, about how you can help us." The following brief excerpt, immediately following the notation about the three inaudible minutes, reflects gaps like those that appear throughout the transcript:

> [MACEIRA]: You know what's good? For you to also be seeing this.
> [DIAZ-COLON]: (Unintelligible).
> [MACEIRA]: What?
> [DIAZ-COLON]: (Unintelligible). Good (unintelligible).
> [MACEIRA]: And then, sometimes it happens to me that -- I had 233 messages in Telegram. In that little while. And sometimes it happens to me that -- in other words, perhaps there's one that I won't see . . . [ellipsis in original]
> Okay, let's talk about the other thing later.
> [DIAZ-COLON]: (Unintelligible).
> [MACEIRA]: About everything you told me, about how you can help us, etcetera [sic].

meeting, leaving ambiguity as to whether the pair continued their conversation beyond that point.

Given the quality of the recording, López's testimony that the conversation was audible and the prosecutor's statement that the government did not seek a transcription of the recording because of its "inaudibility" are both plausible depictions of the recording's condition.[38] Moreover, having listened to the recording, the prosecutors reasonably could have concluded that it would be of little use -- and thus not worth transcribing -- given its gaps; its possible end before the meeting terminated; and the more clearly recorded conversation at Il Postino, which included multiple references to the allegedly extortionate $300,000 demand. Diaz-Colon offers nothing but speculation in suggesting that the government must have secured a transcription and translation and necessarily lied when they said they did not.

Of course, regardless of whether the government saw evidentiary value in the Musa recording, it would be obliged to provide to the defense any evidence in its possession that might have exculpatory or impeachment value. Diaz-Colon insists that the government's disclosure obligation required the government to

_____

[38] We thus disagree with Diaz-Colon's assertion in his brief, stated in bold-faced font, that "L[ó]pez'[s] trial testimony reflects the [g]overnment had possession of a clearly audible recording that was never provided to Diaz-Colon." López acknowledged that he could hear the conversation, not that the recording was clear or complete.

provide him with a transcript and translation.  He provides no legal support, however, for his contention that the government's timely provision of the recording itself was inadequate.  We have in fact indicated to the contrary: "Brady applies to material that was known to the prosecution but unknown to the defense."  United States v. Bender, 304 F.3d 161, 164 (1st Cir. 2002) (emphasis added).  At a sidebar at trial, defense counsel emphasized his pre-trial expectation that he would be receiving a transcript and translation from the government "shortly before trial."  But the recording was the actual evidence, and there were no barriers -- language or otherwise -- preventing the defense from obtaining a translation and transcript earlier if they wanted to use them at trial.

In these circumstances, the district court acted well within its discretion when it rejected Diaz-Colon's claim of prosecutorial misconduct insofar as it was based on the government's interactions with the defense relating to the Musa recording.

### 2.  Maceira's Trial Testimony

Diaz-Colon's claim that the government suborned perjury from Maceira is premised primarily on the absence of any audible reference to the $300,000 demand in the recording of the Musa meeting.  Diaz-Colon contends that Maceira repeatedly testified falsely that he (Diaz-Colon) told Maceira at Musa that

Maldonado-Nieves "was asking for $300,000[] in exchange for the binder [of messages] not [to] be publicly released." Diaz-Colon also complains that the government falsely told the jury in its opening statement that the evidence -- presumably, Maceira's testimony -- would show that he had solicited that $300,000 payment at the Musa meeting and then repeated "[t]his false statement . . . on five occasions."

The Supreme Court has held for more than a half-century "that a conviction knowingly 'obtained through use of false evidence'" violates due process. Glossip v. Oklahoma, 604 U.S. 226, 246 (2025) (quoting Napue v. Illinois, 360 U.S. 264, 269 (1959)). To establish a so-called "Napue violation, a defendant must show that the prosecution knowingly solicited false testimony or knowingly allowed it 'to go uncorrected when it appear[ed].'" Id. (alteration in original) (quoting Napue, 360 U.S. at 269); see also United States v. Vavic, 139 F.4th 1, 28 (1st Cir. 2025). But Diaz-Colon cannot make that showing by relying solely on the Musa recording. As described above, the recording contains numerous "unintelligible" comments, and Maceira's statement after the three-minute inaudible segment -- "everything you told me, about how you can help us" -- is consistent with Diaz-Colon having presented the requirements for avoiding release of the chats at some point in the meeting, even if not captured by the recording. See supra Sections I.B.; II.A.I. Diaz-Colon provides no other,

probative evidence that Maceira knowingly testified falsely about the Musa meeting -- or, more relevantly, that the government was aware of any such falsity.

Moreover, even if Diaz-Colon in fact made no reference to the $300,000 at the Musa meeting, it does not necessarily follow that Maceira's testimony at trial more than three years later was knowingly false rather than a mistaken convergence of memories from his two meetings with Diaz-Colon. As noted above, Maceira acknowledged at trial that he did not report to the grand jury that Diaz-Colon had sought the $300,000 payment at Musa, and the indictment places that demand only at the Il Postino meeting.[39] Importantly, the repeated reference to the $300,000 in the recording of the Il Postino meeting negates the impact on the jury from any inaccuracy about what transpired at Musa. Even when there is knowing falsity in violation of Napue, "a new trial is required [only] if 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury.'" Giglio, 405 U.S. at 154 (omission in original) (quoting Napue, 360 U.S. at 271); see also Glossip, 604 U.S. at 246 (noting that "a new trial is warranted so long as the false testimony 'may have had an effect on the outcome of the trial'" (quoting Napue, 360 U.S. at 272)).

---

[39] The indictment alleges that, at a restaurant meeting "[o]n or about June 21, 2019" -- i.e., at Musa -- Diaz-Colon asked Maceira "to help him with several government contracts through which he received compensation."

In sum, the district court did not abuse its discretion in refusing to either dismiss the indictment or grant Diaz-Colon's motion for a new trial on the ground of prosecutorial misconduct.

### V. Limitation on Cross-Examination

Diaz-Colon argues that the district court violated his Sixth Amendment confrontation right when it limited his cross-examinations of López and Maceira at trial, partially on hearsay grounds. Diaz-Colon challenges, in particular, the court's exclusion of the recording of the July 26 phone call between him and Maldonado-Nieves during cross-examination of López and its refusal to allow defense counsel to question López about the contents of that call. Diaz-Colon also claims the court abused its discretion when it cut off cross-examination of Maceira on several topics.

The Sixth Amendment's Confrontation Clause "guarantees criminal defendants the right to cross-examine witnesses who testify against them." United States v. Casey, 825 F.3d 1, 23-24 (1st Cir. 2016). That right is not unlimited, however, and a district court "possesses a considerable margin of discretion to impose reasonable limits on cross-examination." United States v. Raymond, 697 F.3d 32, 40 (1st Cir. 2012). So long as "a defendant was afforded a reasonable opportunity to impeach a witness" -- a question we review de novo -- the question is whether the restrictions imposed on that opportunity abused the court's

discretion.  United States v. Andino-Rodríguez, 79 F.4th 7, 17 (1st Cir. 2023) (quoting Maldonado-Peña, 4 F.4th at 31).  To establish such an abuse of discretion, an "[a]ppellant must show that the limitations on cross-examination were 'clearly prejudicial.'"  United States v. Sierra-Ayala, 39 F.4th 1, 19-20 (1st Cir. 2022) (quoting United States v. Rosario-Pérez, 957 F.3d 277, 297 (1st Cir. 2020)).  We also apply the abuse-of-discretion standard to a district court's evidentiary rulings, including its judgments on the admissibility of evidence challenged as hearsay.  Maldonado-Peña, 4 F.4th at 29; see also United States v. Colón-Díaz, 521 F.3d 29, 33 (1st Cir. 2008).

We first consider the July 26 phone call between Diaz-Colon and Maldonado-Nieves and then address the cross-examination of Maceira.

## A.  López Cross-Examination and July 26 Recording

Diaz-Colon claims, in essence, that the court's refusal to admit the recording of the phone call into evidence or to allow cross-examination of López on the substance of the call improperly "denied [him] the opportunity to challenge the [g]overnment's case."  He insists that the call -- in which Maldonado-Nieves said that he was not interested in a $300,000 payoff, only revenge -- was essential in refuting the charges against him.  Significantly, however, the district court did not entirely foreclose Diaz-Colon from presenting the call's content to the jury.  Rather, it held

that the conversation was hearsay and that it could be introduced only by one of the call's participants -- i.e., Diaz-Colon or Maldonado-Nieves.

On appeal, Diaz-Colon contends the call was not being offered for its truth and thus was not hearsay. He alternatively offers a host of exceptions to the hearsay rule that he insists apply to the conversation. We conclude that none of these contentions supports overriding the district court's discretionary judgments. It is obvious that the defense sought to introduce the substance of the call for the truth of Maldonado-Nieves's statement that he was seeking revenge and nothing else -- i.e., to show that Maldonado-Nieves was not, in fact, seeking to extort Maceira, thus refuting the government's theory that Diaz-Colon was assisting him in that effort. Although the defense evidently anticipated that Maldonado-Nieves would be a government witness, which would have provided an opportunity for the defense to question him about the call and his intentions, the government's decision not to have Maldonado-Nieves testify does not transform the conversation into admissible non-hearsay. As the government points out, Diaz-Colon does not suggest that he was unable to call Maldonado-Nieves as a witness, which would have allowed introduction of the substance of the telephone call -- as the district court advised -- through the testimony of one of its participants.

As for Diaz-Colon's multiple rationales for admitting the recording or allowing cross-examination of López on its substance based on hearsay exceptions, each such contention falls short. Neither the recording nor López's testimony about what Maldonado-Nieves said during the call was admissible as a present-sense impression by López about an "event or condition . . . perceived" by him. Fed. R. Evid. 803(1). Similarly, neither type of evidence was admissible under the common-law rule of completeness, codified in Rule of Evidence 106, because no part of the conversation was introduced into evidence by the government. See Fed. R. Evid. 106; Hemphill v. New York, 595 U.S. 140, 155 (2022) (explaining that, under the common-law rule of completeness, "a party against whom a part of an utterance has been put in, may in his turn complement it by putting in the remainder" (citation modified) (quoting Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 171 (1988)))). And Maldonado-Nieves's comment about the $300,000 was not admissible against the government under Rule of Evidence 801(d)(2) as an opposing-party statement because Maldonado-Nieves was not the government's agent, and the statement was thus not "made by the party's agent or employee on a matter within the scope of that relationship and while it existed," Fed. R. Evid. 801(d)(2)(D), or "made by a person whom the party authorized to make a statement on the subject," id.

at 801(d)(2)(C).[40] Diaz-Colon's remaining rationale -- that the evidence was admissible to show "the effect of the call on L[ó]pez" -- is equally without merit. That argument appears to be simply another way to claim a non-hearsay use for the evidence, a contention we have already rejected.

Finally, Diaz-Colon's inability to rely on the contents of the July 26 call did not deny him an adequate opportunity to cross-examine López in violation of his Sixth Amendment right to confrontation. Diaz-Colon appears to say that the phone conversation was essential not because it would impeach any specific direct testimony of López, or his credibility more generally, but because it would undermine the premise of one important theory of the government's case -- that he was aiding and abetting an extortion attempt by Maldonado-Nieves. Yet, if Diaz-Colon in fact believed the phone call had such significance for his defense, he had the opportunity to introduce it through one of the participants.

---

[40] To the extent Diaz-Colon is arguing that his portion of the conversation was admissible under Rule 801(d)(2)(C) or (D) because he was acting as the government's agent in placing the call to Maldonado-Nieves and that Maldonado-Nieves's portion of the conversation was therefore admissible to complete the context, we decline to consider that contention. As the government notes, Diaz-Colon did not present this argument to the district court, and he has not shown that the exclusion of the evidence amounted to plain error. See Matta-Quiñones, 140 F.4th at 12.

- 66 -

As the government points out, moreover, the usefulness of the July 26 call to Diaz-Colon's defense is questionable. Maldonado-Nieves's statement in the phone call that he had no interest in the $300,000 does not negate the possibility that Diaz-Colon by that time -- or originally -- had been seeking to extort Maceira for his own benefit. Moreover, despite the district court's refusal to allow explicit testimony from López about the phone call, the jurors knew that the call had been made at the government's request, and defense counsel used its omission from the prosecution's evidence to his client's advantage. His closing argument included the following insinuation that the phone call supported the defense case: "[T]he record is clear that a recording was made of the July 26th conversation with Raulie, and you should take into consideration that fact. The tape existed, and they did not present it in evidence. You make the inferences that you want to make, okay."[41]

---

[41] Earlier in his closing, immediately after noting that the FBI had asked Diaz-Colon to call Maldonado-Nieves, defense counsel stated:

> He called Raulie Maldonado. Interesting, because, let me say something: What is presented in evidence is important, but what is also important is evidence that you are made aware exists that is not presented in evidence by the [g]overnment.

The government objected, but the court allowed the comment. Defense counsel then stated, "What they knew about that they did

- 67 -

Hence, even if there had been a proper basis for allowing admission of the recording or López's testimony on its contents, the district court's contrary judgment would not be vulnerable on appeal. Given the limited probative value of Maldonado-Nieves's disclaimer of a financial interest, and Diaz-Colon's ability to cast doubt on the prosecution's case simply by referring to the phone call's absence from evidence, Diaz-Colon has not "show[n] that the limitations on cross-examination were [so] 'clearly prejudicial'" that the district court abused its considerable discretion in its rulings on the phone-call evidence. Sierra-Ayala, 39 F.4th at 19-20 (quoting Rosario-Pérez, 957 F.3d at 297).

## B. Maceira Cross-Examination

Diaz-Colon claims the district court erred in limiting cross-examination of Maceira on four topics: (1) whether Maceira had falsely denied to the press that he was included in the controversial chat messages, (2) whether he was fired or resigned from his position in the administration, (3) whether his recording of the Musa meeting was unlawful because it was made without Diaz-Colon's knowledge and consent, and (4) whether Maceira was concerned that he would be arrested following the arrest of other members of the Rosselló administration. In his brief, however,

---

not present to you," to which the government again objected. The court sustained that objection.

Diaz-Colon presents no developed argument on why these limitations were prejudicial, other than to say these subjects were "permissible cross[-]examination" relevant to credibility and that "[a] reasonable jury might have a received a significantly different impression of the [g]overnment's case had [Diaz-Colon]'s [c]ounsel been permitted to pursue his proposed lines of cross-examination."

This cursory treatment is inadequate to present the issue for our review. See, e.g., Vavic, 139 F.4th at 35 (invoking "the familiar rule 'that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived'" (quoting United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990))). Although we thus decline to examine Diaz-Colon's four complaints in detail, we note that we agree with the government that none has merit. All involve topics collateral to Diaz-Colon's guilt or innocence, and he had ample opportunity to challenge Maceira's credibility on other, more pertinent grounds. See supra Section II.A.1. Accordingly, there was no abuse of discretion, or violation of Diaz-Colon's Sixth Amendment right to confront witnesses, in the "limitations the trial court imposed on that opportunity." Casey, 825 F.3d at 24.

## VI. Jury Instructions

Diaz-Colon asserts on appeal that the district court improperly rejected five requests he made for changes or additions

to the court's proposed jury instructions.  We address below four of his objections.  The fifth involves his claim that the jury should not have been allowed to consider the contract renewals as an element of the alleged extortionate scheme because, according to the defense (and as discussed above), the contracts did not qualify as transferable property under the Hobbs Act.  When defense counsel raised that concern, however, the district court advised him to object during the government's closing if he believed the government had used the contracts improperly.  The attorney neither objected nor requested a clarifying instruction after the government referred to the contracts in its rebuttal argument.  Given that acquiescence, and in light of our discussion of the Sekhar argument on the merits, see supra Section II.A.4, we see no need to revisit the contract issue in the context of the jury instructions.  Cf. United States v. Noah, 130 F.3d 490, 496 (1st Cir. 1997) ("It is settled in this circuit that, when the district court tentatively denies a pretrial motion in limine, or temporizes on it, the party objecting to the preliminary in limine determination must renew his objection during the trial, and the failure to do so forfeits any objection.").

As we shall describe, three of the four remaining claims of instructional error involve the district court's denial of an instruction.  "To prevail on a claim of failure to give a requested instruction, the requesting party must show that the omitted

instruction was integral to an important part of the case and its content was legally correct and not otherwise substantially covered by the instructions as given." United States v. Rodriguez, 115 F.4th 24, 46 (1st Cir. 2024) (citation modified). We review such a claim de novo. See id. Diaz-Colon's remaining assertion of instructional error, which challenges the substance of an instruction that was given, is subject to "a split standard: we consider de novo whether the instruction correctly stated the law, while we review for abuse of discretion whether the instruction tended to confuse or mislead the jury on the controlling issues." United States v. Cantwell, 64 F.4th 396, 409 (1st Cir. 2023) (citation modified); see also, e.g., United States v. Goris, 876 F.3d 40, 46-47 (1st Cir. 2017) ("A reviewing court is tasked with examining whether [the] instructions, taken as a whole, show a tendency to confuse or mislead the jury with respect to the applicable principles of law." (citation modified)).

## A. The "Substantial Step" Instruction

For Count One, which charged attempted extortion, defense counsel asked the court to add to its instruction that "[m]ere conversations or contemplation to commit the offense, without more, cannot form the basis for a conviction for attempt." Counsel maintained that "clearly, it is not an attempt to merely have a conversation that goes nowhere" and similarly argued that "[i]f I contemplate committing a crime, but I don't do that extra

step, affirmative step that shows that I want to commit the crime, then that is not an attempt." The prosecutor opposed the addition, asserting, "I don't think anyone in this courtroom can reasonably respond on a threats case that the mere language and speaking is not a substantial step in the perpetration of those crimes, including an attempt." After the prosecutor argued that the proposed language would be "highly confusing," defense counsel countered that "it's clarifying because the mere conversation or mere contemplation of committing a crime is not confusing."

The district court denied the defense's request, noting that "the 'attempt' language" it chose tracked the First Circuit's pattern instruction.[42] The court gave the following instruction on the meaning of "substantial step":

> A "substantial step" is an act in furtherance of the criminal scheme. A "substantial step" must be something more than mere preparation, but less than the last act necessary before the substantive crime is completed.[43]

---

[42] We have noted that pattern jury instructions provide an "informal guide" for trial courts but do not "curtail the wide discretion enjoyed by a district court to instruct in language that it deems most likely to ensure effective communication with jurors." United States v. Basilici, 138 F.4th 590, 601 (1st Cir. 2025) (citation modified).

[43] This is the exact language in the pattern instructions for district courts within the First Circuit. See Pattern Criminal Jury Instructions for the District Courts of the First Circuit § 4.18.00, at 87 (2024), https://perma.cc/QXC5-5TYP.

Because Diaz-Colon argues that the district court erred in refusing to add language to its instruction on "substantial step," we view this challenge as "a claim of failure to give a requested instruction" subject to de novo review. Rodriguez, 115 F.4th at 46. Diaz-Colon has not made the requisite showing of error. Although he contends that the instruction was necessary to clarify that an attempt conviction requires more than "[m]ere conversations or contemplation," we agree with the government that the requested reference to conversations would be more confusing than illuminating -- and arguably incorrect -- where, as here, the crime at issue is based on communicated threats.[44] See, e.g., United States v. Marsh, 26 F.3d 1496, 1501-02 (9th Cir. 1994) (stating that the defendant's threatening "phone calls are unequivocal and substantial steps in furtherance of the extortion attempt"); cf. Pérez-Rodríguez, 13 F.4th at 15 (stating that a rational jury could find that the defendant's communications and "subsequent arrival at [a] meeting he arranged . . . constituted a substantial step" toward committing a crime premised on eliciting

---

[44] To the extent Diaz-Colon was seeking through the instruction to minimize the significance of his text exchanges with Maldonado-Nieves or conversations between them that he reported to Maceira -- rather than addressing his conversations with Maceira -- Diaz-Colon did not make that objective clear. Regardless, any such communications plainly would be covered by the court's instruction that "mere preparation" would not be a substantial step "in furtherance of the criminal scheme."

a response from a victim).[45]  The request to expressly exclude "mere contemplation" of committing a crime as a substantial step was wholly unnecessary given the instruction that "something more than mere preparation" was necessary.

In sum, the district court did not err in refusing to adopt Diaz-Colon's proffered alternative to the instruction on "substantial step."  His proposed language could have introduced unnecessary confusion on the nature of an attempt to commit extortion, and the court's instruction "substantially covered" the important caveat that simply planning a crime -- or even preparing to commit one -- does not suffice to support a finding of criminal attempt.  Rodriguez, 115 F.4th at 46 (quoting Shervin v. Partners Healthcare Sys., Inc., 804 F.3d 23, 47 (1st Cir. 2015)).

## B. Aiding-and-Abetting Instruction

The objection that Diaz-Colon makes to the district court's aiding-and-abetting instruction is difficult to discern and thus arguably insufficiently developed to warrant our attention.  However, we choose to follow the government's lead in

---

[45] Although the defendant in Pérez-Rodríguez "arranged" the referenced meeting, see 13 F.4th at 15, and Diaz-Colon met with Maceira at Maceira's request, we see little significance to that factual difference in the context of this case.  A rational jury could conclude that Diaz-Colon's message was intended to, and did, prompt the meetings between him and Maceira for the purpose of discussing how Maceira could avoid the threatened harm.  On that basis, a rational jury could have found that Diaz-Colon's meetings with Maceira, in combination with his communications, amounted to a substantial step toward committing extortion.

generously construing the issue as a claim that the court should have given a specific unanimity instruction -- i.e., advising the jurors that they needed to all agree on the theory of criminal liability -- because Counts One and Two were duplicitous in charging both principal and accomplice liability. But the premise of that contention is flawed. As discussed above, see supra Section II.A.2, the government may properly charge in a single count both principal and aiding-and-abetting liability as alternative theories for proving criminal responsibility for the crime of attempted extortion in violation of the Hobbs Act. The government similarly could rely on both theories for Count Two's charge that Diaz-Colon transmitted a threatening communication in violation of 18 U.S.C. § 875.

Hence, Counts One and Two were not duplicitous in alleging Diaz-Colon's culpability as either a principal or aider and abettor. And the district court's instructions accurately presented the alternative theories:

> You may find the defendant guilty of the offenses charged in Count One (attempted extortion) and Count Two (interstate extortion communication) of the indictment without finding that he personally committed each of the acts that make up the crimes or that he was present while the crimes were being committed. Any person who in some way intentionally participates in the commission of a crime can be found guilty either as an aider and abettor or as a principal offender. It makes no difference which label you attach. The person who aids and abets to commit a crime

- 75 -

is as guilty of the crime as he would be if he had personally committed each of the acts that make up the crimes.

The court then went on to explain what it means to aid and abet, and it detailed the elements the government must prove to establish aiding and abetting.[46]

Diaz-Colon has thus identified no error in the court's aiding-and-abetting instructions.

## C. Omission of "Wrongful" in Instructions Defining "Threat"

In the section of his brief titled "Summary of Argument," Diaz-Colon asserts that the district court erred when it "refus[ed] to include the word 'wrongful' as part of the definition of 'threat' in its instructions to sustain counts One and Two of the indictment." He further argues in his summary that the court's failure "to categorize a 'threat' as being 'wrongful' to convict [allowed] the jury . . . to consider legitimate First Amendment expressions as a crime."

Despite previewing this argument in his summary, Diaz-Colon did not substantively address the omission of "wrongful" in the section of his brief devoted to instructional

_____

[46] The court also provided a general unanimity instruction:

Any verdict must represent the considered judgment of each one of you. In order to return a verdict[,] it is necessary that each juror agree to it. In other words, your verdict must be unanimous.

errors. Instead, as part of a longer excerpt of defense counsel's colloquy with the district court on various jury instructions, he reproduced counsel's argument that the instruction on the Hobbs Act charge -- the crime alleged in Count One -- needed "to distinguish between wrongful threats and legitimate threats" and that, "as to [the] Hobbs Act, before the word 'threat,' you should always put 'wrongful' threat."

Although once again we could bypass this assertion of error as undeveloped, see Vavic, 139 F.4th at 35, we instead explain briefly why it is unavailing. The key flaw in Diaz-Colon's argument concerning Count One is that the district court's instructions did in fact advise the jurors that they needed to find a wrongful threat. The court explained that, to find the defendant guilty on Count One, the jury needed to conclude that the government had proven three elements beyond a reasonable doubt:

> First, that the defendant knowingly and willfully attempted to obtain property from a person;
>
> Second, that the defendant did so by means of attempted extortion;
>
> Third, that the attempted extortion affected interstate commerce.

The court then elaborated on those requirements and, among other information, provided a definition of extortion:

> "Extortion" means obtaining property from another person with his or her consent, but where that consent is obtained by wrongful use

- 77 -

> of actual or threatened fear. Defendant must
> know that he was not legally entitled to the
> property.

(Emphasis added.) And, when subsequently referring specifically to the elements of the attempt charge, the court stated that, "to prove the crime of attempt to extort as charged in Count One of the indictment, the [g]overnment must prove . . . that the defendant intended to commit the crime of extortion" -- i.e., that, consistent with the court's just-given definition of "extortion," he used a threat wrongfully.

Thus, not only did the district court use the word "wrongful" in its definition of "extortion," but it also specifically included the knowledge element -- i.e., that he knew "he was not legally entitled to the property" -- that made the demands for property wrongful. See Sturm, 870 F.2d at 773-74. By contrast, in United States v. Jackson, where the court found erroneous "the district court's instruction to the jury on the meaning of 'extort' as that term is used in § 875(d)," the instruction stated "simply that 'to extort means to obtain money or a thing of value from another by use of threats to reputation.'" 180 F.3d at 71.[47] In identifying the problem with that instruction,

_____

[47] Although the Second Circuit's discussion concerned charges under 18 U.S.C. § 875(d), see Jackson, 180 F.3d at 65-71, the court -- as noted above -- equated the understanding of "intent to extort" in that provision with the meaning of extortion under other provisions, including the Hobbs Act, 18 U.S.C. § 1951, see id. at 67-70.

the Second Circuit noted that "[t]he court gave no other explanation of the term 'extort' and did not limit the scope of that term to the obtaining of property to which the defendant had no actual, or reasonable belief of, entitlement." Id. Here, the instruction clearly advised the jurors that, to find the threat underlying the extortion charge wrongful, they needed to find that Diaz-Colon "kn[e]w that he was not legally entitled to the property" he attempted to obtain.

As for Count Two -- which charged "Interstate Extortion" by means of Diaz-Colon's original message to Maceira -- Diaz-Colon is correct that the district court's instructions more than once referred to a "threat" without prefacing it with the adjective "wrongful" or explaining the "wrongfulness" aspect of the intent-to-extort element of 18 U.S.C. § 875(d). The government appears to acknowledge that the court erred in failing to "instruct[] the jury on a wrongfulness requirement as to Count Two" but asserts that the error was harmless. Accepting that the instruction was flawed, we agree that its imprecision was harmless in this case given the instructions as a whole and the evidence.

First, the instructions on Count Two specified the need to find an extortionate purpose for the communication:

> In Count Two of the indictment, the defendant is accused of transmitting a threat in interstate or foreign commerce. It is against federal law to transmit any communication in interstate or foreign

commerce that contains a threat to damage the reputation of another person.  For you to find the defendant guilty of this crime, you must be convinced that the [g]overnment has proven each of the following things beyond a reasonable doubt:

First, that the defendant knowingly sent a message in interstate or foreign commerce containing a true threat to damage the reputation of another person; and

Second, that the defendant did so <u>with the intent to extort money or something else of value to the defendant</u>.

(Emphasis added.)

The court should have prefaced each reference to "a threat" in the Count Two instructions with the modifier "wrongful" or reiterated that, to find that Diaz-Colon had an "intent to extort money or something else of value," the jury needed to find that he had no "claim of right to the property" sought by means of the threatening communication.  <u>Sturm</u>, 870 F.2d at 773; <u>see</u> <u>also</u> <u>Jackson</u>, 180 F.3d at 71.  However, we are satisfied that the court's instructions overall, on the record before us, did not allow the jurors to reach a guilty verdict on Count Two without finding all required elements of § 875(d).  <u>See</u>, <u>e.g.</u>, <u>Jones</u> v. <u>United States</u>, 527 U.S. 373, 391 (1999) ("Our decisions repeatedly have cautioned that instructions must be evaluated not in isolation but in the context of the entire charge."); <u>Katana</u>, 93 F.4th at 533 (same).

The court told the jurors they needed to find that the defendant's communication was sent with an extortionate intent. The court had just provided the definition of "extortion" quoted above -- specifying the requirement that the "[d]efendant must know that he was not legally entitled to the property" sought. Having been given that definition of extortion, the jurors would understand that the reference to "the intent to extort" in the Count Two instructions required them to find that the defendant knew he lacked a legal entitlement to the targeted property.[48] The instructions on Count Two also explained that "[t]o act with 'intent to extort' means to act with the purpose of obtaining money or something of value from someone who consents because of the true threat," and the court defined "[a] 'true threat' [as] a serious threat, not idle talk, a careless remark, or something said jokingly, that is made under circumstances that would place a reasonable person in fear of damage to his or her reputation, or damage to another person's reputation." Together, these instructions told the jurors that a guilty verdict on Count Two required them to find that Diaz-Colon made a serious threat of harm to Maceira that was intended to extract money to which Diaz-Colon had no legal entitlement.

---

[48] In the trial transcript, the court's full set of instructions spans roughly twenty-two pages. The "intent to extort" instruction appears about two pages after the definition of "extortion."

Moreover, as the government argues, we see no possibility that the jury, having convicted Diaz-Colon on Count One, would find that the communicated threat alleged in Count Two was not wrongful within the meaning of § 875(d). In reaching a guilty verdict on Count One, the jurors necessarily found -- as required by the court's instructions on that count -- that Diaz-Colon attempted to obtain property through the "wrongful use of actual or threatened fear" and that he knew he "was not legally entitled to th[at] property." Diaz-Colon did not claim at trial, in his post-trial motions, or on appeal that he had a "plausible claim of right" to the $300,000 or other funds sought. Jackson, 180 F.3d at 71. Rather, as the government points out in its brief, "[h]is defenses were that he was passing along a message from Maldonado-Nieves and warning his friend (Maceira) about the potential release of damaging information, and that he did have the means of extorting Maceira because Maldonado-Nieves was the one who possessed the damaging chat messages." Appellee's Br. at 111 (citation omitted).

Finally, as described above in our discussion of Diaz-Colon's sufficiency challenge to the jury's verdict on Count Two, the evidence that Diaz- Colon sent the message on June 20 with an intent to extort can fairly be described as "overwhelming" given the conversations at Musa and Il Postino, among other interactions between the two men after Diaz-Colon sent the

threatening message.  See United States v. López-Soto, 960 F.3d 1, 8 (1st Cir. 2020).

Hence, even though the Count Two instructions did not explicitly include reference to, or explanation of, a "wrongful" threat, we think it clear beyond a reasonable doubt that, if such language had been included, the jury still would have returned a guilty verdict on that count.  See Neder v. United States, 527 U.S. 1, 15 (1999) (holding that a jury instruction that omits an element of an offense can be found harmless where "it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained" (citation modified) (quoting Chapman v. California, 386 U.S. 18, 24 (1967))); United States v. Pullman, 139 F.4th 35, 47 (1st Cir. 2025) (noting that the Supreme Court "extend[ed] harmless-error review to a jury instruction that erroneously omitted an element of the offense").

## D.  Instruction to Disregard "Attempt" Language for Counts Two and Three

Diaz-Colon argues that the district court erred in refusing to instruct the jury that Counts Two and Three in the indictment -- in contrast to Count One -- do not allege attempt crimes.  Such an instruction was necessary, he asserts, because the indictment's allegations for Counts Two and Three incorporated a section of the indictment specific to Count One that contained the following subheading: "Diaz-Colon attempts to extort additional money from [Maceira] to prevent the release of

additional Telegram messages."  Diaz-Colon argued to the district court that "this language is unfairly prejudicial to the defendant because it is misleading the jury into thinking that the offense conduct of Count[s] Two and Three includes an attempt, which is not part of these offenses."

This claim of instructional error is unavailing for multiple reasons.  First, the language Diaz-Colon cites was not, in fact, incorporated into Counts Two and Three.  Although the text of each Count includes a paragraph stating that "[t]he allegations in paragraphs 1 through 18 of this Indictment are realleged and incorporated herein by reference," the targeted subheading is not within any of the incorporated paragraphs.  It appears between paragraphs 11 and 12.

Second, we see no likelihood of misunderstanding by the jury concerning the theory of liability for Counts Two and Three. The jurors had a copy of the indictment during their deliberations. As the government points out, "[t]he sub-heading contained only a factual allegation, not language charging attempt as a legal offense."  By contrast with Count One -- which bears the heading "Attempted Extortion" -- Counts Two and Three are labeled as completed crimes: "Interstate Extortion" for Count Two, and "Destruction, Alteration, or Falsification of Records in a Federal Investigation" for Count Three.  Third, the court instructed the jury on the elements of completed crimes for Counts Two and Three.

Fourth, and finally, the evidence presented at trial supported the theory that Diaz-Colon had committed those crimes and not merely attempted them.

***

Diaz-Colon has thus failed to show error in any of the instructions he challenges.

**VII. Conclusion**

Having found no basis for reversing or vacating the jury's verdicts, we affirm the judgment of guilt on each count.

<u>So ordered.</u>